

# COURT OF APPEALS
### SECOND DISTRICT OF TEXAS
### FORT WORTH

### NO. 02-08-00226-CV

LINDA FAUST AND DONNIE
FAUST

APPELLANTS

V.

BNSF RAILWAY COMPANY

APPELLEE

------------

## FROM THE 96TH DISTRICT COURT OF TARRANT COUNTY

------------

## OPINION

------------

### I. INTRODUCTION

Appellants Linda Faust and Donnie Faust sued Appellee BNSF Railway Company (BNSF) for personal injuries and damages that they allegedly sustained from exposure to chemicals released by BNSF's wood treatment facility in Somerville, Texas. After a lengthy trial, a jury rendered a verdict in favor of BNSF, concluding that BNSF's negligence, if any, did not proximately

cause Linda's stomach cancer. In two issues, the Fausts argue that the trial court committed reversible error by overruling their objection to a specific causation instruction and that the evidence is factually insufficient to support the jury's "No" answer to question number 1. We will affirm.

## II. FACTUAL AND PROCEDURAL BACKGROUND

The Fausts live in Somerville. Linda moved there and married Donnie in 1980. Donnie has lived in Somerville most of his life. The Fausts' home is located approximately 4,000 feet from the Somerville Tie Plant.

Donnie began working at the plant in 1974. He performed a number of different duties, including working as a "roustabout," driving a trash truck, and operating various machinery. Donnie came into contact with creosote when he worked at the plant and often had creosote on him when he came home from the plant.

Linda worked a number of different jobs that were located near the plant, shopped near the plant, and, many times, visited Donnie at the plant during his lunch break. She smoked between one-half and one full pack of cigarettes every day for twenty-five years; began experiencing headaches, nausea, and stomach pain in the early 1980s; and had a twelve-year medical history of stomach problems. In 1998, Linda was diagnosed with diffuse signet cell stomach cancer

and Helicobacter pylori infection (H. pylori). She subsequently underwent a radical complete gastrectomy, in which her entire stomach was removed.[1]

BNSF's predecessor, the Atchison, Topeka & Santa Fe Railway (AT&SF), began operating the plant in 1905.[2] The plant, which occupied a 200-acre tract of land in Burleson County and operated twenty-four hours a day, treated railroad ties and other wood products with chemicals to preserve the wood and increase the products' service life. A mixture of creosote[3] and extender oil (predominantly 30% creosote and 70% oil) was the primary chemical applied to the ties in one of four treating cylinders measuring 8 feet in diameter by 155 feet in length.[4] Each treating process (commonly referred to by plant employees as a "charge") lasted between eight and twenty-four hours, depending on whether the ties had been air dried or needed to be vapor dried in the treating cylinder using a drying agent.[5]

---

[1]Linda successfully treated the H. pylori before undergoing the surgery to remove her stomach.

[2]BNSF sold the plant to Koppers, Inc. in 1995. Koppers currently operates the plant.

[3]The creosote used at the plant—a black, oily material—was derived from coal tar. The International Agency for Research on Cancer (IARC) classifies creosote as probably carcinogenic to humans.

[4]One of the Fausts' experts testified that the plant also treated wood products with pentachlorophenol (PCP), a now-banned pesticide, and copper chromium arsenate (CCA), another pesticide. The expert agreed, however, that the plant had not used PCP and CCA since 1981.

[5]The primary solvent that the plant used to accelerate the wood-drying process was naptha.

3

The plant generated several types of waste:

- drainage from a treating cylinder consisting of creosote mixture and possibly wood fragments that accumulated in a "pit" located in front of the cylinder door when the door was opened after the completion of a charge;

- "kickback" (also known as "drippage"), which consisted of residual creosote mixture that dripped off of treated ties that were removed from a cylinder and onto rock ballast or "screening" that was laid directly underneath the tracks on which the "trams" that carried the ties rolled;[6]

- before the plant began using chains, treated wood slats (spacers) that were placed in between the ties during the treatment process;

- sawdust used to absorb chemicals and to clean the cylinders and pits;

- boiler emissions, which may have included dioxins[7] and polycyclic aromatic hydrocarbons (PAHs),[8] from burning treated wood in a boiler[9]

- wastewater (also called "sap water") resulting from the process of vapor-drying wood products; and

- emissions released into the atmosphere from several different sources.

_____

[6]In 1992, the plant built a "drip pad"—a concrete pad with an underlying reservoir—to help collect kickback from the treated wood products. Before 1992, the kickback dripped onto the soil or ballast.

[7]Dioxin is a byproduct of incomplete combustion of a source containing chlorine. The IARC classifies dioxin as carcinogenic to humans.

[8]PAHs are a byproduct of incomplete combustion of organic materials. According to one of BNSF's experts, PAHs are found "all over the place. Everywhere." But the IARC classifies benzo[a]pyrene, a PAH, as probably carcinogenic to humans.

[9]From the late 1930s to the early to mid 1980s, the "Babcock-Wilcox" boiler supplied steam energy for the treating process. The "Keeler" boiler came online to replace the Babcock-Wilcox boiler in the mid 1980s. Both boilers were biomass, or wood-fired, boilers.

The amount of waste that the plant generated and the means by which the plant disposed of it or used it was hotly contested at trial.

The Fausts alleged that BNSF negligently allowed the release of toxic and hazardous chemicals, solvents, and substances into the soil, groundwater, water, and air in and around the plant; that they have been and continue to be exposed to the toxic chemicals released from the plant; and that their bodies, real property, and home have been contaminated by the chemicals, proximately causing them injuries and damages, including, but not limited to, cancer. At trial, each side offered expert testimony relevant to, among other things, the disputed fact issues of negligence and causation. As part of its charge, the trial court submitted the following instruction to the jury: "In order to prove specific causation for exposure from the Somerville Tie Plant, the Plaintiffs must exclude, with reasonable certainty, other plausible causes of Linda Faust's stomach cancer, such as her history of smoking cigarettes and her Helicobacter pylori infection."[10] Jury question number 1 asked whether "the negligence, if any, of [BNSF was] a proximate cause of Linda Faust's stomach cancer." The jury answered, "No," and, as instructed, did not proceed to answer any of the remaining questions. In accordance with the jury's verdict, the trial court entered

---

[10]The trial court also instructed the jury that "[t]he only substances whose exposure you are to consider are PAHs and dioxin; you are not to consider any exposure to other chemicals, including chromium (VI), arsenic, CCA, or PCP."

5

a take-nothing judgment on the Fausts' claims against BNSF, and it denied the Fausts' motion for new trial. The Fausts filed their notice of this appeal.

### III. SPECIFIC CAUSATION INSTRUCTION

In their first issue, the Fausts argue that the trial court committed reversible error by overruling their objection to the specific causation instruction. They contend that the instruction was erroneous because it (1) improperly heightened their burden of proof, (2) improperly shifted the trial court's gatekeeper function to the jury, and (3) constituted an impermissible comment on the weight of the evidence. They further argue that the inclusion of the instruction was harmful because the jury expressed some confusion about it and rendered its verdict shortly after the trial court addressed a jury note inquiring in part about the instruction. BNSF responds that the Fausts failed to preserve part of their first issue for appellate review, that the trial court did not abuse its discretion by including the instruction in the charge, and that, even if erroneous, the trial court's inclusion of the instruction was harmless.

### A. Preservation of Error

An objection to the jury charge must timely and plainly make the trial court aware of the complaint, and the complaining party must obtain a ruling. *Ford Motor Co. v. Ledesma*, 242 S.W.3d 32, 43–44 (Tex. 2007); *State Dep't of Highways & Pub. Transp. v. Payne*, 838 S.W.2d 235, 241 (Tex. 1992) (op. on reh'g); *see* Tex. R. App. P. 33.1(a); Tex. R. Civ. P. 274 (requiring a party objecting to a charge to point out distinctly the objectionable matter and the

6

grounds of the objection).  If a party fails to do this, error is not preserved, and the complaint is waived.  *Payne*, 838 S.W.2d at 241.

The Fausts asserted the following objection to the specific causation instruction at the charge conference:

> Mr. Woodfill:  With respect to the instruction, Your Honor, the other objection we had was to paragraph 2, information regarding Linda Faust's cigarette smoking and the Helicobacter -- H. pylori bacteria infection.  *We believe that this is an improper role of the Court's gatekeeper function and should not be included in the instruction*.  And we believe it's unfairly prejudicial to the client.  It can be argued in the proximate cause section that's addressed in Question Number 1, I believe.  Additionally, Your Honor, we don't believe that there was any evidence -- Well, that's enough.  [Emphasis added.]

The Fausts' objection did not timely and plainly make the trial court aware that they were objecting on the grounds that the instruction improperly heightened their burden of proof and constituted an impermissible comment on the weight of the evidence, nor were these arguments apparent from the context of the objection.  *See, e.g., Fethkenher v. Kroger Co.*, 139 S.W.3d 24, 31–32 (Tex. App.—Fort Worth 2004, no pet.) (holding that appellant's objection did not make trial court aware of complaint that instruction was an impermissible comment on weight of the evidence).  We cannot agree with the Fausts' contentions that an objection to the shifting of the gatekeeper function from the trial court to the jury "is necessarily" an objection to the trial court adding elements to the Fausts' burden of proof that do not exist under the law and "is necessarily" an objection

that the trial court is commenting on the weight of the evidence. This argument conflicts with the dictates of rule of appellate procedure 33.1(a) and *Payne*.

Citing *Payne*, the Fausts argue that their objection at the charge conference was sufficient to preserve this issue with regard to any of the legal bases for the objection because they submitted a proposed jury charge in writing that did not include the specific causation instruction. *Payne* did not hold that submitting a jury charge in writing that omitted a later complained-of instruction was sufficient to preserve error as to the inclusion of the instruction on any legal basis. Rather, *Payne* held that "[t]here should be but one test for determining if a party has preserved error in the jury charge, and that is whether the party made the trial court aware of the complaint, timely and plainly, and obtained a ruling." *Payne*, 838 S.W.2d at 241. Consistent with its holding, the supreme court reasoned in part that the State had preserved its charge error issue for appellate review because it had requested that the trial court question the jury about Payne's knowledge of the culvert, and the trial court's refusal to do so "constituted a clear refusal to submit a premise defect theory to the jury." *Id.* at 239. Thus, the trial court could not have clearly refused to submit the premise defect question if it was not aware that the State had requested that the question be submitted.

Here, unlike in *Payne*, the Fausts are not complaining on appeal about the trial court's refusal to include in the charge a specifically requested question. Instead, they are complaining about the inclusion of an instruction that was not

8

part of the proposed jury charge that they submitted to the trial court. The difference is significant because in *Payne*, the State timely made the trial court aware that it specifically desired the inclusion of the question in the charge. *Id.* In this case, there is nothing in the record to indicate that the Fausts timely made the trial court aware that they were objecting to the instruction on the grounds that it heightened their burden of proof and amounted to a comment on the weight of the evidence, including by merely omitting the specific causation instruction from their proposed jury charge. Therefore, other than identifying the proper standard for preserving charge error, *Payne* is factually distinguishable from this case and, consequently, inapposite.

Accordingly, we hold that of the three arguments the Fausts assert on appeal, the objection lodged at the charge conference was sufficient to preserve for appellate review only their second argument—that the instruction improperly shifted the trial court's gatekeeper function to the jury. *See Ledesma,* 242 S.W.3d at 43–44; *Payne*, 838 S.W.2d at 241; *see also* Tex. R. App. P. 33.1(a).

### B. No Abuse of Discretion

The Fausts argue that "[t]o the extent the cases require a scientific expert to exclude other plausible causes 'with reasonable certainty,' that requirement *relates solely* to the trial court's determination under Rule 702 on whether the testimony is reliable and admissible." [Emphasis added.] They thus maintain that the instruction "clearly incorporated elements for the court, not the jury, to consider when making a determination as to the admissibility of the offered

9

testimony" and, therefore, that the instruction "improperly place[d] in the hands of the jury the trial court's gatekeeper function." BNSF responds that the instruction correctly stated the law, had evidentiary support, and assisted the jury in resolving contested fact issues.

A trial court must submit "such instructions and definitions as shall be proper to enable the jury to render a verdict." Tex. R. Civ. P. 277; *Union Pac. R.R. Co. v. Williams*, 85 S.W.3d 162, 166 (Tex. 2002). An instruction is proper if it (1) assists the jury, (2) accurately states the law, and (3) finds support in the pleadings and evidence. *Columbia Rio Grande Healthcare, L.P. v. Hawley*, 284 S.W.3d 851, 855 (Tex. 2009). Rule 277 affords the trial court considerable discretion in deciding what instructions are necessary and proper. Tex. R. Civ. P. 277; *State Farm Lloyds v. Nicolau*, 951 S.W.2d 444, 451–52 (Tex. 1997). In fact, a trial court is afforded even more discretion when submitting instructions than when submitting questions. *GuideOne Lloyds Ins. Co. v. First Baptist Church of Bedford*, 268 S.W.3d 822, 836–37 (Tex. App.—Fort Worth 2008, no pet.). Thus, determining necessary and proper jury instructions is a matter within the trial court's discretion, and appellate review is for abuse of that discretion. *Shupe v. Lingafelter*, 192 S.W.3d 577, 579 (Tex. 2006). A trial court abuses its discretion if it acts in an arbitrary or unreasonable manner or without reference to any guiding rules or principles. *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241–42 (Tex. 1985), *cert. denied*, 476 U.S. 1159 (1986).

10

The Fausts' argument disregards the distinction between the trial court's responsibility to determine whether proffered scientific evidence is based on a reliable foundation and, therefore, admissible and a proponent's burden to prove causation in a toxic tort case in which an expert relies on epidemiological studies to support his opinion that the plaintiff's exposure to a particular substance caused the plaintiff's complained-of injury.[11]

Rule 702 requires the proponent of expert testimony to show not only that the expert is qualified, but also that the expert's testimony is relevant to the issues in the case and is based on a reliable foundation. *E.I. du Pont de Nemours and Co. v. Robinson*, 923 S.W.2d 549, 556 (Tex. 1995). When a party objects to the reliability of its opponent's scientific expert testimony, the trial court—in exercising its gatekeeper function—is responsible for making the preliminary determination of whether the proffered testimony meets the standards of scientific reliability. *Id.* at 556–57; *see Helena Chem. Co. v. Wilkins*, 47 S.W.3d 486, 499 (Tex. 2001); *see also Exxon Pipeline Co. v. Zwahr*, 88 S.W.3d 623, 629 (Tex. 2002). If the trial court sustains an objection to expert testimony, the proponent of the evidence may complain on appeal that the trial court abused its discretion by excluding the evidence. *See Ledesma*, 242 S.W.3d at 39; *Gammill v. Jack Williams Chevrolet, Inc.*, 972 S.W.2d 713, 718–19

---

[11]*See generally Lakie v. SmithKline Beecham*, 965 F. Supp. 49, 55 (D.D.C. 1997) (stating that the "defendant confuses, at times ignores, the crucial distinction between the *admissibility* of expert scientific testimony and the *weight* such testimony should be afforded by the trier of fact") (emphasis in original).

(Tex. 1998).  If, on the other hand, the trial court overrules an objection to expert testimony, the opponent of the evidence may complain on appeal that the evidence is legally insufficient to support the jury's causation finding because the scientific evidence is unreliable and, thus, no evidence.[12]  *See Havner*, 953 S.W.2d at 714; *Austin v. Kerr-McGee Refining Corp.*, 25 S.W.3d 280, 285 (Tex. App.—Texarkana 2000, no pet.).  A party must object to the evidence before trial or when the evidence is offered to preserve a complaint on appeal that scientific evidence is unreliable.  *Mar. Overseas Corp. v. Ellis*, 971 S.W.2d 402, 409–11 (Tex. 1998).  *But see Coastal Transp. Co. v. Crown Cent. Petroleum Corp.*, 136 S.W.3d 227, 232 (Tex. 2004) (reasoning that an objection is not needed to preserve a no-evidence challenge to conclusory testimony).

Distinct from the trial court's rule 702 reliability determination is a complainant's burden to prove causation, a fact question, in a toxic tort case.  In addition to explaining that an appellate court must go beyond an expert's bare conclusions when performing a legal sufficiency review and determine whether the expert's opinion is scientifically reliable, the supreme court in *Havner* identified the evidentiary standard that a plaintiff must satisfy to prove causation

---

[12]When determining whether expert testimony constitutes some evidence, i.e., is legally sufficient, the appellate court must look beyond the expert's bare conclusions and make a threshold determination whether the expert's opinion is scientifically reliable.  *Havner v. Merrell Dow Pharm., Inc.*, 953 S.W.2d 706, 711–14 (Tex. 1997).  The appellate court performs this sufficiency review because if the expert's testimony is not scientifically reliable, it is, legally, no evidence and, thus, cannot survive a legal sufficiency review.  *Id.* at 714.

in a toxic tort case:  general and specific causation.  *Havner*, 953 S.W.2d at 714*.* General causation asks whether a substance is capable of causing a particular injury in the general population, and specific causation asks whether that substance caused a particular individual's injury.  *Id.*; *Georgia-Pacific Corp. v. Stephens*, 239 S.W.3d 304, 308 (Tex. App.—Houston [1st Dist.] 2007, pet. denied).  The cases—both state and federal—are legion that a plaintiff in a toxic tort case must prove general and specific causation.  *See, e.g., Golden v. CH2M Hill Hanford Group, Inc.*, 528 F.3d 681, 683 (9th Cir. 2008); *Knight v. Kirby Inland Marine Inc.*, 482 F.3d 347, 351 (5th Cir. 2007); *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 268 (2d Cir. 2002); *King v. Burlington N. Santa Fe Ry. Co.*, 762 N.W.2d 24, 34 (Neb. 2009); *Parker v. Mobil Oil Corp.*, 857 N.E.2d 1114, 1120–21 (N.Y. 2006); *Mobil Oil Corp. v. Bailey*, 187 S.W.3d 265, 270 (Tex. App.—Beaumont 2006, pet. denied); *Brookshire Bros., Inc. v. Smith*, 176 S.W.3d 30, 36–37 (Tex. App.—Houston [1st Dist.] 2004, pet. denied) (op. on reh'g).

"By far the most difficult problem for plaintiffs to overcome in toxic tort litigation is the burden of proving causation."  *James v. Bessemer Processing Co., Inc.*, 714 A.2d 898, 909 (N.J. 1998) (citing *Ayers v. Jackson Twp.*, 525 A.2d 287, 301 (N.J. 1987)).  This is because, in some cases, "controlled scientific experiments can be carried out to determine if a substance is capable of causing a particular injury or condition, and there will be objective criteria by which it can be determined with reasonable certainty that a particular individual's injury was

13

caused by exposure to a given substance." *Havner*, 953 S.W.2d at 714–15. "However, in many toxic tort cases, direct experimentation cannot be done, and there will be no reliable evidence of specific causation." *Id.* at 715. Therefore, to prove causation, the plaintiff may attempt to demonstrate through circumstantial evidence that exposure to the substance at issue increases the risk of the plaintiff's particular injury. *See id.* As in this case, this may be achieved through testimony in which an expert relies on epidemiological studies to support his opinion that the plaintiff's exposure to a particular substance caused the plaintiff's complained-of injury. *Id.* Epidemiological studies examine existing populations to attempt to determine if there is an association between a disease or condition and a factor suspected of causing that disease or condition. *Id.*

But "[e]vidence that a chemical *can* cause a disease is no evidence that it *probably* caused the plaintiff's disease." *In re Allied Chem. Corp.*, 227 S.W.3d 652, 656 (Tex. 2007) (orig. proceeding); *see Merck & Co., Inc. v. Ernst*, 296 S.W.3d 81, 96 (Tex. App.—Houston [14th Dist.] 2009, pet. filed) ("Proving one type of causation does not necessarily prove the other, and both are needed for a plaintiff in a toxic-tort suit to prevail"). Therefore, "[t]*o raise a fact issue on causation* . . . , a claimant must do more than simply introduce into evidence epidemiological studies that show a substantially elevated risk." *Havner*, 953 S.W.2d at 720 (emphasis added). To prove specific causation, the complainant must show that he is similar to those in the studies. *Id.* This burden to show similarity includes "proof" that the injured person was exposed to the same

14

substance, that the exposure or dose levels were comparable to or greater than those in the studies, that the exposure occurred before the onset of injury, and that the timing of the onset was consistent with that experienced by those in the study. *Id.*; *Matt Dietz Co. v. Torres*, 198 S.W.3d 798, 804 (Tex. App.—San Antonio 2006, pet denied). The burden of proof also requires that "*if* there are other plausible causes of the injury or condition that could be negated, *the plaintiff must offer evidence excluding those causes with reasonable certainty*." *Havner*, 953 S.W.2d at 720 (emphasis added).

Although the issue here concerns the "other plausible causes" aspect of the specific causation inquiry, the supreme court recently addressed a different part of the inquiry—dose—in the context of an asbestos exposure case. In *Borg-Warner Corp. v. Flores*, the supreme court held that to prove specific causation in an asbestos exposure case, there must be some *evidence* of an aggregate dose of exposure to the plaintiff that was a substantial factor in causing the asbestos-related disease. 232 S.W.3d 765, 769–70 (Tex. 2007). In explaining the significance of dose, the supreme court cited *Havner* and reiterated that "[w]e have held that epidemiological studies are without *evidentiary significance* if the injured person cannot show that 'the exposure or dose levels were comparable to or greater than those in the studies.'" *Id.* at 771 (emphasis added). *Borg-Warner* did not involve an inquiry into the reliability of an expert's testimony, i.e., the exercise of the trial court's gatekeeper function; rather, it considered the legal sufficiency of the specific causation evidence as a quantitative measure.

15

Case law reveals that instructing the jury about the appropriate causation standard is sometimes required, as it was here. *See Hawley*, 284 S.W.3d at 859–62. In *Hawley*, a health care liability case against a hospital involving lost chance of survival, the trial court refused to give the jury an instruction that a patient's recovery is barred if a condition preexists the negligence of the health care provider and at the time of the negligence, the condition resulted in the patient having a 50% or less chance of cure or survival. *Id*. at 855, 859–60. The hospital argued on appeal that the trial court erred by not instructing the jury that the plaintiff "must have had a greater than fifty percent (50%) chance of survival" for the hospital's alleged negligence to be the proximate cause of the plaintiff's death. *Id.* at 859. The supreme court agreed, reasoning that "[t]he instruction would have provided to the jury the standard it was required by law to apply in making its finding on a hotly-contested issue." *Id.* at 862. This was necessary because,

> [a]s this Court stated over a century ago when considering alleged charge error, "[w]e must look at the court's charge as practical experience teaches that a jury, untrained in the law, would view it." It asks too much of lay jurors, untrained in the law, to distill the correct Texas legal standard for loss of chance from the general proximate cause instruction given by the trial court. Columbia's requested loss of chance instruction would have assisted the jury, was an accurate statement of applicable law, and was supported by the pleadings and evidence. The trial court abused its discretion by refusing to give it.

*Id.* (citations omitted).

16

Here, the record demonstrates that there was evidence of other plausible causes of Linda's gastric cancer: H. pylori and cigarette smoking. Peter Shields, M.D., testified for BNSF that H. pylori is an established cause of stomach cancer and that, by itself, it was a substantial cause of Linda's stomach cancer. He also testified that there is a "pretty broad consensus" that smoking can cause stomach cancer and that he could not imagine what evidence someone could review in this case to conclude that smoking was not the cause or a substantial contributor to Linda's stomach cancer.

The Fausts elicited testimony in an effort to exclude cigarette smoking and H. pylori as causes of Linda's stomach cancer. James Dahlgren, M.D. opined that Linda's stomach cancer was caused by dioxins and PAHs from the plant, and he testified that he was able to exclude both H. pylori and smoking as causes of Linda's stomach cancer.[13] The Fausts thoroughly cross-examined Dr. Shields about his causation opinions.

Accordingly, although we agree with the Fausts that it is the role of only the trial court to determine whether an expert's testimony is reliable, we disagree with their argument that the burden to exclude other plausible causes of injury

---

[13]Dr. Dahlgren relied on epidemiological studies to support his causation opinion.

17

relates solely to the trial court's rule 702 reliability inquiry.[14] The Fausts had the burden to prove causation—both general and specific—in this chemical exposure case, and they attempted to meet that burden primarily through the testimony of an expert witness who relied on epidemiological studies. There was evidence of other plausible causes of Linda's gastric cancer, and the Fausts made an effort to exclude those causes through Dr. Dahlgren's testimony. The complained-of instruction is an accurate, albeit arguably incomplete, statement of the law, identifying what Linda must show to raise a fact issue as to causation.[15] *See Havner*, 953 S.W.2d at 714–15, 720. And instructing the jury that other plausible causes of Linda's gastric cancer must be excluded with reasonable certainty assisted the jury by providing it with "the standard it was required by law to apply in making its finding on a hotly-contested issue"—causation.[16] *See Hawley*, 284 S.W.3d at 855, 862; *Havner*, 953 S.W.2d at 720. We hold that the trial court did

---

[14] *See, e.g., Mendes-Silva v. United States*, 980 F.2d 1482, 1487 (D.C. Cir. 1993) ("Dr. Bulle gave specific testimony on his basis for ruling out viral causes and other explanations for the encephalomyelitis, and Dr. Lane suggested in response that alternative explanations for Ms. Mendes-Silva's illness nonetheless remained. The evaluation of these competing explanations presents 'a classic battle of the experts, a battle in which the [factfinder] must decide the victor.'").

[15] The Fausts do not argue that the instruction was improper because it identified only part of specific causation.

[16] When objecting to the instruction, the Fausts' attorney said, "It can be argued in the proximate cause section that's addressed in Question Number 1, I believe."

18

not abuse its discretion by including the specific causation instruction in the jury charge.

## C. Harm

Even if the instruction was improper, we cannot conclude that it was harmful. A judgment will not be reversed for charge error unless the error was harmful because it probably caused the rendition of an improper verdict or probably prevented the petitioner from properly presenting the case to the appellate courts. Tex. R. App. P. 44.1. We review the entire record to determine whether the submission or refusal to submit an instruction probably resulted in an improper judgment. *Timberwalk Apartments, Partners, Inc. v. Cain*, 972 S.W.2d 749, 756 (Tex. 1998).

The Fausts argue that the instruction was harmful because the jury expressed some confusion about it in a note and rendered its verdict shortly after the trial court responded to the note inquiring about the instruction. The note stated,

> The instructions indicate that "In order to prove specific causation for exposure from Somerville Tie Plant, the Plaintiffs must exclude, with reasonable certainty, other plausible causes of Linda Faust's stomach cancer, such as her history of smoking cigarettes and her H. Pylori infection."
>
> On question 2 it gives us the ability to give a % to both Linda & the railroad. The question is if we say the smoking/infection are not causes, how can we give a % to Linda? Or vice versa if we say the smoking/infection were partial causes how can we give the RR a %?
>
> The instructions seem to contradict Question 2.

19

The trial court responded,

> Your observation that a contradiction exists is well-taken.
>
> You are, therefore, instructed that you are not to answer Question 1b as to Linda Faust, nor are you to answer Question 2.
>
> The instruction given you in paragraph 3 on page 3 still applies.

But it is just as reasonable to conclude that the trial court ameliorated the jury's confusion when it withdrew Linda's name from jury question number 1 and withdrew jury question number 2 (the proportionate responsibility question) in its entirety. This consequently limited the jury to making a finding in regard to only BNSF's negligence, if any, that proximately caused Linda's stomach cancer.

Also, by the time the trial court charged the jury, it had already exercised its gatekeeper function and permitted the Fausts' designated causation expert, Dr. Dahlgren; negligence expert, Nicholas Cheremisinoff, Ph.D.; and dose expert, Paul Rosenfeld, Ph.D.; to testify at trial. Before trial, BNSF had moved to strike each of the experts' testimony on the grounds that the testimony was irrelevant and scientifically unreliable, but the trial court exercised its gatekeeper function and permitted the Fausts to elicit expert testimony from each of them. There is nothing in the record demonstrating that the jury played any role in determining the admissibility of Dr. Dahlgren's, Dr. Cheremisinoff's, Dr. Rosenfeld's, or any other expert's testimony before they presented their opinions in evidence.

20

Further, the charge is crystal clear regarding exactly what the jury was to do and not to do in performing its ultimate duty as factfinder. For example, the charge informed the jury that it was "the sole judge[] of the credibility of the witnesses and the weight to be given their testimony"; that it was to "consider only the evidence introduced here under oath"; and, among other things, that it was to "not consider or discuss anything that is not represented by the evidence in this case." No part of the charge specifically or inferentially instructed or otherwise informed the jury that it was *not* to assess the weight and credibility of the Fausts' experts' testimony in the event it concluded that the testimony was irrelevant or scientifically unreliable. The jury is presumed to have followed the trial court's instructions. *See Hawley*, 284 S.W.3d at 862 (citing *Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 771 (Tex. 2003)). Accordingly, it is mere speculation to conclude that the jury—contrary to both the entire charge and the presumption that the jury followed the trial court's instructions—somehow read the complained-of instruction as adding an additional component to the jury's responsibility to determine the weight and credibility of the experts' testimony that is akin to the trial court's gatekeeper function of allowing or disallowing an expert to offer opinion testimony.

Moreover, both the Fausts' and BNSF's causation experts relied on epidemiological studies to support their opinions. To be considered reliable scientific evidence of general causation, an epidemiological study must (1) have

21

a relative risk of 2.0[17] and (2) be statistically significant at the 95% confidence level.[18] *Havner,* 953 S.W.2d at 717–18, 723–24. To the extent the *Robinson* factors, the Bradford Hill criteria, or both are relevant to the court's gatekeeper function,[19] they each have their own detailed requirements.[20] Consequently, in the absence of additional, detailed instructions, the specific causation instruction did not fully arm the jury with the tools that it needed to even exercise a gatekeeper function. *See Exxon Corp. v. Makofski*, 116 S.W.3d 176, 180 (Tex. App.—Houston [14th Dist.] 2003, pet. denied) ("Undoubtedly, the tools used to test the reliability of expert testimony will vary depending on the field of expertise

---

[17]This means that the risk of an injury or condition in the exposed population is more than double the risk in the unexposed or control population. *Havner*, 953 S.W.2d at 717–18.

[18]This means that if the study was repeated numerous times, the confidence interval would indicate the range of relative risk values that would result 95% of the time. *Havner*, 953 S.W.2d at 723–24.

[19]The *Havner* court cautioned that "[o]ther factors must be considered" because epidemiological studies show only an association. *Havner*, 953 S.W.2d at 718.

[20]The *Robinson* factors include: (1) the extent to which the theory has been or can be tested, (2) the extent to which the technique relies upon the subjective interpretation of the expert, (3) whether the theory has been subjected to peer review and publication, (4) the technique's potential rate of error, (5) whether the underlying theory or technique has been generally accepted as valid by the relevant scientific community, and (6) the nonjudicial uses that have been made of the theory or technique. *Robinson*, 923 S.W.2d at 557. The Bradford Hill criteria include: (1) the strength of association, (2) consistency of association, (3) specificity of association, (4) temporality, (5) biological gradient or dose-response relationship, (6) plausibility, (7) coherence, (8) experimental evidence, and (9) analogy. *Havner*, 953 S.W.2d at 718 n.2.; *Torres*, 198 S.W.3d at 804 n.4.

involved. But it is impossible to ignore the *Havner* factors here, as the field of expertise is the same—the epidemiological evidence connecting a chemical exposure and a disease."); *Austin*, 25 S.W.3d at 287 ("[A] trial court could not properly review the reliability of scientific testimony based on epidemiological studies if it were required to ignore the basic principles articulated in *Havner* that the scientific community employs in conducting such studies.").

Finally, as BNSF points out, the entire record demonstrates that the jury could have reasonably concluded that the Fausts failed to carry their burden of proof that BNSF was negligent or that BNSF's negligence proximately caused Linda's stomach cancer, notwithstanding the instruction.

For all of these reasons, we hold that even if the trial court abused its discretion by overruling the Fausts' preserved objection to the specific causation instruction, the error was not harmful. *See* Tex. R. App. P. 44.1. We overrule the Fausts' first issue.

## IV. EVIDENTIARY SUFFICIENCY

In their second issue, the Fausts argue that the evidence is factually insufficient to support the jury's finding that BNSF's negligence, if any, was not the proximate cause of Linda's stomach cancer. In light of the broad-form submission, the jury's "No" answer to question number 1 could have been based upon the jury's refusal to find either that BNSF was negligent or that any such negligence was a proximate cause of Linda's stomach cancer. *See Hutchison v. Pharris*, 158 S.W.3d 554, 562 (Tex. App.—Fort Worth 2005, no pet.) (stating that

23

appellate court need not address evidentiary sufficiency to support negligence finding of broad-form submission if court held that evidence supported proximate cause finding); *Carr v. Jaffe Aircraft Corp.*, 884 S.W.2d 797, 802–03 (Tex. App.—San Antonio 1994, no pet.).  Therefore, to sustain this issue, the evidence must be factually insufficient to support the jury's refusal to find both that BNSF was negligent and that any such negligence was a proximate cause of Linda's stomach cancer.

### A.    Standard of Review

When reviewing an assertion that the evidence is factually insufficient to support a finding, we set aside the finding only if, after considering and weighing all of the evidence in the record pertinent to that finding, we determine that the evidence supporting the finding is so weak, or so contrary to the overwhelming weight of all the evidence, that the answer should be set aside and a new trial ordered.  *Pool v. Ford Motor Co.*, 715 S.W.2d 629, 635 (Tex. 1986) (op. on reh'g); *Garza v. Alviar*, 395 S.W.2d 821, 823 (Tex. 1965); *In re King's Estate*, 150 Tex. 662, 244 S.W.2d 660, 661 (1951).  When the party with the burden of proof appeals from a failure to find, as in this case, the party must show that the failure to find is against the great weight and preponderance of the evidence.  *Cropper v. Caterpillar Tractor Co.*, 754 S.W.2d 646, 651 (Tex. 1988); *see Herbert v. Herbert*, 754 S.W.2d 141, 144 (Tex. 1988).

**B. Factually Sufficient Evidence to Support Jury's "No" Answer—Negligence[21]**

Much of the evidence that the Fausts presented in regard to whether BNSF was negligent came from the testimony of Dr. Cheremisinoff, who performed a "responsible care analysis" of the plant for the Fausts. Dr. Cheremisinoff described his task and the methodology that he used to perform the analysis as follows:

> [Dr. Cheremisinoff]: Okay. What I do is I look at the operations. Since I'm a chemical engineer, I'm able to dissect the manufacturing process. So I looked at the manufacturing process to make treated wood ties, and I determined the amount of waste that was generated and the types of waste. So after quantifying those wastes, I then examined what practices were used by the railroad to manage those wastes; and I compared those practices to the available standards of the day and the technologies of the day to manage those wastes; and I -- I rendered an opinion as to whether they did -- they used proper technologies, procedures, and practices to -- to manage those wastes.
>
> . . . .
>
> [Fausts' counsel]: Doctor, when you conduct a responsible care analysis, are you -- and you're trying to look at what a company did, are you looking at whether they acted responsible or were negligent in a particular case or situation?
>
> [Dr. Cheremisinoff]: It can be. In this case, that's exactly what I focused on.

---

[21]Jury question 1 defined "Negligence" as the "failure to use ordinary care, that is, failing to do that which a person of ordinary prudence would have done under the same or similar circumstances or doing that which a person of ordinary prudence would not have done under the same or similar circumstances." *See IHS Cedars Treatment Ctr. of DeSoto, Tex., Inc. v. Mason*, 143 S.W.3d 794, 798 (Tex. 2004) (identifying elements of negligence cause of action as the existence of a legal duty, a breach of that duty, and damages proximately caused by the breach).

[Fausts' counsel]: When you're doing a responsible care or negligence analysis, do you look at how a company manages its hazardous or its toxic waste?

[Dr. Cheremisinoff]: Well, yes. When I talk about responsible care, it's almost exclusively with regard to dangerous or hazardous materials. That's my area of expertise.

. . . .

[Fausts' counsel]: Okay. In forming your opinions in this case, Doctor, can you tell the ladies and gentlemen of the jury about the methodology that you used.

[Dr. Cheremisinoff]: Well, yeah. The methodology is essentially the same. What I do is essentially a reconstruction of the practices. I look at the manufacturing operation, and I do what is known as a material balance. I know what chemicals go into the process and what chemicals go out with the product -- in this case treated wood ties -- and then I determine what portion of the chemicals entered into different waste streams: air, water, and solid waste. That's part of the analysis.[22]

Dr. Cheremisinoff opined that BNSF negligently operated the plant because it failed to properly dispose of waste; emitted harmful toxins into the atmosphere; failed to use a pollution control device on its boilers; failed to perform any air monitoring of the emissions from the boilers; failed to inform its employees of the risks associated with exposure to the chemicals used at the plant; and, among other things, failed to heed various recommendations, including to provide its

---

[22]In forming his opinions, Dr. Cheremisinoff reviewed internal memoranda and correspondence between BNSF, the State, vendors, and chemical suppliers; reviewed the plant's operating procedures; reviewed the boiler operations; reviewed remedial investigation reports; reviewed depositions and other experts' reports; reviewed relevant scientific literature; interviewed a number of former plant employees; and visited the plant twice.

26

employees with protective clothing and equipment. In performing the factual sufficiency review, we will address Dr. Cheremisinoff's opinions and all of the other evidence pertinent to the jury's refusal to find that BNSF was negligent. *See Pool*, 715 S.W.2d at 635; *Garza*, 395 S.W.2d at 823.

### 1. Disposal of Waste

### a. Waste Fed into Boilers from 1980 to 1994

Dr. Cheremisinoff opined that BNSF was negligent because it burned toxic waste in its boilers, emitting harmful dioxins and PAHs into the atmosphere. He opined that BNSF burned a total of 47,875,261 pounds (or 119,688 drums) of toxic cylinder drainage waste, kickback waste, and treated wood waste in its boilers from 1980 to 1994.[23]

### (1) Cylinder Drainage

In arriving at the 47 million pound burned-waste figure, Dr. Cheremisinoff calculated in part that 3.5 tons of cylinder drainage emptied from the cylinder every time its door opened and that 30% of that amount (10% from 1986 to 1994) was ultimately fed into the boiler as fuel.[24]

Dennis Davis, who began working at the plant in 1971, agreed with Dr. Cheremisinoff's figure that 3.5 tons of cylinder drainage emptied from the cylinder

---

[23]Dr. Cheremisinoff's drum figures are based on a fifty-five gallon capacity drum (or barrel).

[24]Dr. Cheremisinoff testified on cross-examination that 3.5 tons of cylinder drainage equaled roughly "six plus drums." However, he also testified that the same amount equaled "[f]our drums."

each time the door opened. Davis testified that between two and ten barrels of "mulk," which consisted of creosote mixture, debris, wainscot, and sand, emptied into the pit when a cylinder door opened; that employees cleaned up the "mulk" with sawdust and wood chips after every charge; and that the waste was then taken to the fire room to be burned at night.

Donnie Faust testified that he saw the cylinder doors open only between twenty and thirty times and that approximately ten to one hundred gallons of cylinder drainage emptied from the cylinder when the door opened. Donnie cleaned a pit only once, but he did not see where the waste was taken.

A number of witnesses' testimony conflicted with Dr. Cheremisinoff's opinions regarding the amount of cylinder drainage and the burning of waste in the boilers. Donald Corwin, a combustion and incineration consulting engineer who testified for BNSF, disagreed with Dr. Cheremisinoff's figures that 3.5 tons of drainage emptied from a cylinder each time the door opened following a charge, describing the figures as "[w]ay too high." He opined that less than five gallons emptied from the cylinder and that the material was collected in the sump, reclaimed, and reused.

Sam Barkley was the plant's superintendent from 1971 to 1986. He testified that a "minute amount" or a "gallon" of cylinder drainage emptied into the pit when the cylinder door opened and that the creosote mixture went down a drain to be separated and reused. Barkley recalled that the engineers would "pull vacuums" on the product while it was still in the cylinders in order to

28

recapture as much of the creosote mixture as possible for separation and reuse. When the pits were cleaned, which was not during every shift, a "small" amount of cylinder waste was collected and put in barrels and landfilled, not burned in the boiler.

Vernon Welch was the plant's superintendent from 1986 to 1994. He testified in his deposition that 100% of the cylinder drainage was reclaimed, cleaned, and reused or disposed of off-site in later years. If sawdust was used to clean a pit in later years, it was disposed of in a dumpster.

Mike Mendoza worked at the plant for thirty-nine years and testified in his deposition that none of the cylinder drainage that accumulated in the pits was burned in boilers. Instead, the drainage was reclaimed and reused. Mendoza testified that sawdust was used to clean the pits and that the sawdust was burned in a boiler, but that the pits were not cleaned every day.

Bobby Urbanowsky, who worked at the plant from 1977 to 1995, testified that, depending on how powerful of a vacuum was applied to the cylinder before the charge completed, only two to five barrels of cylinder drainage emptied from a cylinder when its door opened. Of the two to five barrels of drainage, the portion that consisted of creosote and liquid went down a drain to be reclaimed and reused. When he cleaned up the waste that remained in the pit (bark, wood products, slush), it filled only "a couple of barrels," and he never saw where the barrels were taken. Urbanowsky opined that 3.5 tons of cylinder waste could empty from a cylinder only if its door opened when the cylinder was still full of

29

treating material. Although he did not know how often the pit was cleaned, when he was responsible for cleaning the pit, he did not do so after every charge.[25]

Mark Stehly, BNSF's assistant vice-president of environmental and research and development, testified that he had seen the cylinder doors open after a charge, that only a "very small amount" of product emptied out, and that the product went down a drain and was ultimately reused. Similarly, David Malter, an industrial hygienist for AT&SF from 1980 to 1987, testified that only a "few gallons" emptied from the cylinder when its door opened. David Shaw, the plant's current manager, testified that when Koppers took over the plant, only about two to three gallons of treating mixture emptied from the cylinder when its door opened after a charge.

A 1980 "Industrial Hygiene Report" produced by the National Institute for Occupational Safety and Health (NIOSH) mentioned nothing about burning cylinder drainage in the boiler. The report did, however, state that "[a] vacuum is applied at the end of the treatment cycle to remove excess creosote solution." Dr. Cheremisinoff agreed on cross-examination that his calculations would be too high if no cylinder drainage was burned in the boiler.

---

[25]A 1982 letter to the Texas Department of Water Resources stated that "cylinder sludge" consisting of wood chips, sawdust, and dirt contaminated with treating mixture is removed from the treating cylinders "*once every sixteen months, at which time it is handled off-site for disposal*." [Emphasis added.] Dr. Cheremisinoff agreed during cross-examination that the cylinders are cleaned every sixteen months.

30

## (2)   Kickback

Dr. Cheremisinoff opined that from 1980 to 1994, millions of pounds of kickback from treated wood products contaminated the track area and ballast located outside the cylinders and that a percentage[26] of the contaminated ballast was fed into the boiler every day.[27]  To transport the contaminated ballast to the boiler to be burned, Dr. Cheremisinoff opined that workers fed the material into a "hog"[28] and that pneumatic lines moved the material into the boiler.[29]

Likewise, Davis testified that sawdust was used to soak up kickback and that the waste was burned in the boiler.  He described the rock that the kickback settled onto as "little screening," not ballast.  Davis opined that between two and eight barrels of kickback waste was collected and burned each day.

Donnie Faust testified that before 1992, a "bunch" of kickback dripped off of the trams and onto the soil.  He said that you could not help but get it on you because it was "everywhere."

---

[26]For example, based on the 1984 figures, Dr. Cheremisinoff opined that *twenty* drums of contaminated ballast (containing sand and moisture) were fed into the boilers *every day*.

[27]Dr. Cheremisinoff referenced a 1994 Pollution Prevention Plan prepared by Radian Corporation that stated "[a]bout 80 tons of waste [is] typically generated each year from cleanup of creosote drips along tracks."

[28]Dr. Cheremisinoff opined that a hog is "basically a chipper.  You . . . use this to shave, chop up wood chips into smaller particles."

[29]He was not sure if a hog was used as part of this process in the 1980s.

Contrary to Dr. Cheremisinoff's, Davis's, and Donnie's testimony, Corwin testified that Dr. Cheremisinoff's kickback figures were off by a factor of a thousand. For example, Dr. Cheremisinoff calculated that the plant generated 11,179,485 pounds of kickback in 1984. Corwin opined that the figure should have been approximately 11,000 pounds. Corwin also opined that it was not plausible that contaminated ballast was fed into the boiler through pneumatic lines because the rocks would tear up the system.

Welch testified that the ballast under the tram track was never removed but that the screening around the track was "occasionally scraped"—maybe once a year or less—to remove contaminated material and was then shipped off.

Barkley testified that only a "minute" amount of kickback dripped from the treated product and trams onto the screening. He also opined that it was not possible to put ballast or screening into a hog without destroying it; according to Barkley, the hog was for wood.

Mendoza testified the contaminated ballast and rock underneath the tram track was collected with a tractor "every so often," not every day, and filled into holes in the yard.

And Urbanowsky testified that the amount of kickback from the treated wood products that fell onto the area around the track depended on "how good a vacuum they had pulled on" the product in the cylinder. He recounted that before the drip pad was installed, the trams had compartments that caught kickback and that some of that material would "slosh[]" out onto the ballast. Urbanowsky

opined that "a barrel or two, maybe, at the most" would drip from the treated product or trams and onto the ground and that the plant workers would either scoop it up (if there was enough of it) or cover it with dirt. He said that the contaminated ballast would be cleaned up "[i]f you [had] a bad enough mess" and that he did not think that contaminated ballast was collected on a daily basis. Urbanowsky did not know how the plant disposed of contaminated ballast, but he did not think it was possible for the ballast to be thrown into a hog—and he had never seen or heard of that being done before—because the rocks would "mess the hog up" and the "[s]uction may not be strong enough to push it" up into the boiler. He recalled that from 1992 to 1995, after the drip pad was installed, the kickback cleaned up from the drip pad was put in barrels and "shipped out," not burned in the boiler, as Dr. Cheremisinoff's figures reflect.

### (3)    Treated Wood

Dr. Cheremisinoff opined that from 1980 to 1989, hundreds of thousands of pounds of treated wood spacers were burned in the plant's boilers, contributing to the release of dioxins and PAHs into the atmosphere.[30] Donnie Faust testified that he was responsible for driving a trash truck at the plant in the late 1970s and early 1980s and that, except for the early years, he transported four tons of treated wood to the boiler every night to be burned. Davis testified that he fed treated wood into the Babcock-Wilcox boiler every night and

---

[30]Dr. Cheremisinoff also opined that the plant was negligent because treated material was shipped to the plant from several other locations.

33

sometimes during the day and that treated wood was shipped to the plant from off-site to be burned.[31]

Contrary to Dr. Cheremisinoff's, Donnie's, and Davis's testimony, Corwin opined that, based on his calculations, no more than one ton of treated wood was burned per day.[32] He also testified that the plant quit using wood spacers in 1985 or 1986 and that Dr. Cheremisinoff's figures were too high because they included calculations for treated wood for the years 1987 and 1988. Corwin's

---

[31]Urbanowsky testified that treated sawdust from cutting treated wood at the sawmill was fed into the boiler, too, but his testimony about the quantity of treated sawdust fed into the boiler was vague.

[32]Corwin testified:

[BNSF counsel]: All right. Now, the -- on the treated wood poundage right here, is -- you feel that this -- Based on your understanding of what went on at the Somerville tie plant, do you think [Dr. Cheremisinoff's] treated wood calculations are appropriate or correct?

[Corwin]: They're not quite correct.

[BNSF counsel]: Why not?

[Corwin]: Well, the one number, if you take a look at 1981, the 730,000 is based on a 1 ton per day number. And then he took that number and ratioed the total volume production for the rest of the time to that number. He should have taken the 1 ton per day, calculated what the total mass volume flow rate -- or total volume is that would be associated with that and then ratio it down.

[BNSF counsel]: Did Dr. Cheremisinoff take into consideration the burying of any of the strips at all?

[Corwin]: No, he did not.

34

figures are consistent with a figure set out in a 1981 draft permit for the installation of the Keeler boiler, which identified a "Wood Waste Production Rate[]" at "1 ton/day maximum" of wood strips. The document stated that "[t]his waste is currently [landfilled]," but it indicated that "[i]n the future[,] these kiln sticks will be chipped up and stored in a surge bin from which they will be slowly metered into the boiler where they will be used as fuel."

Stehly, who in 1982 was the director of environmental quality for AT&SF, testified that he knew treated wood was being burned to fuel the boiler; that the treated wood constituted a "relatively small amount" of the total wood that was burned; and, significantly, that the plant was allowed to burn treated wood because it had a permit issued by the State to do so.[33]

Mendoza agreed that treated wood or sawdust was shipped to the plant and burned in the Babcock-Wilcox boiler, but he recalled that a "very little amount" of treated wood was burned in the Keeler boiler. Similarly, Welch testified that treated wood spacers were buried and that "very little" treated wood chips or sawdust was burned. And Barkley testified that the plant burned treated wood but that it "didn't have that much volume of it."

---

[33]Dr. Cheremisinoff agreed that the plant had a 1981 permit that allowed it to burn one ton of treated wood per day and a 1994 permit that allowed it to burn four barrels of treated wood per month.

### b.	Incinerator

Dr. Cheremisinoff opined that BNSF was negligent because it did not use an incinerator to dispose of creosote-treated wood waste. According to Dr. Cheremisinoff, unlike the plant's boiler, which was designed to generate energy, an incinerator would have operated at temperatures high enough to completely destroy the waste and any toxins.[34] He testified that the plant had considered installing an incinerator as early as the 1970s and had even completed an application for a permit to install a trench incinerator, but that the plant ultimately withdrew the application and did not install an incinerator.

Corwin, however, testified that a trench incinerator would not have achieved complete combustion of creosote-treated wood waste and that it would not have been appropriate to use at the plant. He opined that the Keeler boiler achieved complete combustion of wood products and dioxins and that its level of combustion was greater than that of an incinerator.

### c.	Other Disposals of Waste

The Fausts contend on appeal that BNSF was negligent because it disposed of sap water in several unlined lagoons or pits to evaporate over time

---

[34]Dr. Cheremisinoff opined that the waste fed into the boilers was not burned for a long enough period of time or at a high enough temperature to destroy dioxins and PAHs.

and spread cylinder drainage and kickback about the property to control dust.[35]

But unlike with fly ash, bottom ash, vapor emissions, and fugitive emissions, Dr. Cheremisinoff did not include naturally evaporating sap water or waste spread for dust control as "emission sources" in his emissions calculations.[36] And like the evidence pertinent to the amount of creosote-treated waste produced and burned in the boiler, the evidence regarding the spreading of creosote mixture for dust control was conflicting.[37]

### 2. Air Emissions, Pollution Control, and Air Monitoring

Dr. Cheremisinoff opined that BNSF negligently operated the plant because it emitted significant quantities of dioxins and PAHs into the atmosphere. He calculated the levels of toxins in the fly ash and bottom ash emitted from incompletely combusting creosote-treated wood waste in the boilers, in the emissions from unloading and charging cylinders, and in the fugitive emissions from treated wood ties on the drip pad.

---

[35]Davis and Mendoza also recalled a procedure referred to as a "Santa Fe flush," in which wastewater was flushed into a ditch located on the plant's property when there was a heavy rainstorm.

[36]Indeed, Gale Hoffnagle testified for BNSF that the sources of PAHs at the plant include "the boiler stacks and then the process itself, including opening of the treatment cylinder, the vents from the process . . . [,] the storage tanks for creosote, and the wood that's laying out in the -- in the yard. They all emit some PAHs."

[37]Welch recalled that reclaimed diesel and water were used to address dust.

Dr. Cheremisinoff also opined that BNSF was negligent because it did not use a pollution control device on its boilers, which would have captured dioxins and PAHs "as particulate forms." He testified that various types of pollution control devices, including dry scrubbers, wet scrubbers, countercurrent scrubbers, rotary kilns, afterburners, and cyclones, had been available for commercial use for years.

Dr. Cheremisinoff further opined that BNSF was negligent because it did not perform any air monitoring of the boilers' emissions, which would have informed BNSF of the quality of the emissions from the boilers' stacks, and did not perform any air models, which would have informed BNSF of Somerville's exposure to the plant's emissions. He reasoned that BNSF could have used opacity sensors on its boilers, performed stack testing, or had a certified stack test performed.

Contrary to Dr. Cheremisinoff's testimony, Corwin testified that Dr. Cheremisinoff's ash numbers were high and, thus, incorrect because they were off by a factor of ten.[38] He also opined that Dr. Cheremisinoff's overall dioxin and PAH emission figures were high because they were based on amounts of waste that were not fed into the boiler, as addressed in detail above, and because the boiler had a higher combustion efficiency than what was calculated—the boiler completely combusted dioxins and PAHs. Corwin further opined that it was

_____

[38]Corwin testified that burning wood typically produces only .5% ash, not 5% ash as Dr. Cheremisinoff calculated.

38

obvious that the Keeler boiler had a multiclone on it (the original permit showed a model number and specifications for a multiclone) and that the multiclone— though not truly a "pollution control device" as it was used on the Keeler boiler— operated to enhance the combustion process of the unit, thus ensuring "that you're burning out the carbon to get all the energy from it to have very little emissions on organics."[39]   Corwin testified that black smoke emitted from the boilers' stacks as a result of "upset conditions" and was part of the combustion process.  And as Dr. Cheremisinoff agreed, the plant had never been cited for any air permit violations.

Stehly testified that the plant never performed any air models because there was no indication that the plant's emissions were harming anyone.  Stehly's testimony is supported by the evidence demonstrating that the plant burned significantly less creosote-treated waste than that calculated by Dr. Cheremisinoff and either buried or burned other amounts of waste.

### 3. Employee Safety and Information

Dr. Cheremisinoff opined that BNSF was negligent because it did not inform its employees of the dangers associated with working around the chemicals used at the plant or provide them with protective clothing and equipment when they worked around the chemicals, as recommended by

_____

[39]Dr. Cheremisinoff seemed to concede on cross-examination that he was wrong about the Keeler boiler not having a multiclone on it.

39

numerous material safety data sheets (MSDS) and several NIOSH studies.[40]  Dr. Cheremisinoff testified that without using appropriate protective equipment, chemicals could soak through clothes and contact the body or be taken home and be exposed to others, and he saw no evidence that BNSF informed the Fausts about the chemicals that they were exposed to.

Donnie testified that when he cleaned the cylinders, he was never given a respirator, rubber gloves, or an apron; instead, the plant provided him with only a hard hat and safety glasses.  He also said that no one explained to him what was in creosote and that he did not learn of an MSDS until Koppers took over.

Likewise, Davis testified that the plant never told him to avoid contact with creosote,[41] that he was not given rubber gloves until the late 1990s, and that he did not know what an MSDS was before 1995.  Urbanowsky testified that he was not told that the chemicals he worked with were hazardous or that he should wear gloves or other protective equipment.

---

[40]For example, several MSDSs recommended using rubber/neoprene gloves, overalls or an apron, and a face shield to protect against clothing contamination and skin contact from creosote.  The 1980 NIOSH report recommended that employees who came into contact with creosote wear appropriate clothing and shower before leaving the plant, if necessary.  The 1977 NIOSH report similarly recommended that protective clothing be worn.  Dr. Cheremisinoff also testified about a 1980 letter drafted by David Malter in which Malter recommended, among other things, that protective clothing be provided to employees who have the potential for contact with creosote and that a general meeting be held to advise the employees of the meaning of the NIOSH results.

[41]In fact, Davis recalled being told that creosote was not harmful.

40

Welch, on the other hand, testified that the plant had safety meetings; that MSDSs were explained to employees, were on file, and were available for viewing; that industrial hygienists gave presentations to employees; and that employees were furnished with protective gloves, coveralls, and, depending on the position, respirators and possibly face shields.

Similarly, Barkley testified that protective equipment, including gloves, boots, respirators, and aprons, were provided to employees; that MSDSs were available for employees to view; and that he attended safety committee meetings once a month. Barkley also authored a document entitled "Procedures For Use of Respirators," which stated in part that "[q]ualified personnel will instruct persons required to use respirators as to the proper respirator and its correct application" and that "[i]ndividuals entering treating cylinders for inspection or cleaning will wear an approved air supplied respirator."

And Malter testified that the plant had a "formal hazard communication program" and communicated with employees about MSDSs and potential chemical hazards. When he visited the plant in 1981, employees used PVC rain suits and respirators when cleaning cylinders, and the plant made skin creams available to employees though the industrial hygiene program.

Finally, we note that while Dr. Cheremisinoff opined that employees wearing creosote-contaminated clothing could have exposed others in their homes to creosote, Dr. Rosenfeld, the Fausts' dose expert, unequivocally

41

testified that he did not calculate a daily dose for Linda's take-home exposure from Donnie's possibly contaminated clothing.

### 4.    Factual Sufficiency Conclusion

In the face of conflicting evidence, including conflicting expert testimony, we may not substitute our own judgment for that of the jury's. *See, e.g., Quiroz ex rel. Quiroz v. Covenant Health Sys.*, 234 S.W.3d 74, 84–85 (Tex. App.—El Paso 2007, pet. denied) (holding evidence factually sufficient to support jury's failure to find defendants negligent).  Having considered and weighed all of the evidence in the record pertinent to the jury's refusal to find that BNSF was negligent, the evidence supporting the finding is not so weak, or so contrary to the overwhelming weight of all the evidence, that the answer should be set aside. *See Pool*, 715 S.W.2d at 635; *Garza*, 395 S.W.2d at 823; *King's Estate*, 150 Tex. at 664, 244 S.W.2d at 661.  Accordingly, we hold that the evidence is factually sufficient to support the jury's refusal to find that BNSF was negligent.[42]  We overrule the Fausts' second issue.

---

[42]We therefore do not address the sufficiency of the evidence to support the jury's refusal to find that BNSF's negligence, if any, proximately caused Linda's stomach cancer.  *See* Tex. R. App. P. 47.4; *Hutchison*, 158 S.W.3d at 562; *Carr*, 884 S.W.2d at 802–03.

## V. Conclusion

Having overruled the Fausts' two issues, we affirm the trial court's judgment.

BILL MEIER
JUSTICE

PANEL:  WALKER, MCCOY, and MEIER, JJ.

DELIVERED:  January 27, 2011