

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
## FORT WORTH

## NO. 02-11-00067-CV

| | | |
|---|---|---|
| Crosstex DC Gathering Company, J.V. | § | From the Probate Court |
| | § | of Denton County (ED-2007-00402) |
| v. | | |
| Terry Titus Button, Ossie A. Button, T & O Legacy, Ltd., and Southwest Securities, FSB, f/k/a First Savings Bank, FSB | § | January 24, 2013 |
| | § | Opinion by Justice Dauphinot |

## JUDGMENT

This court has considered the record on appeal in this case and holds that there was no error in the trial court's judgment. It is ordered that the judgment of the trial court is affirmed.

It is further ordered that each party shall bear its own costs of this appeal, for which let execution issue.

SECOND DISTRICT COURT OF APPEALS


By_____
Justice Lee Ann Dauphinot



# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
## FORT WORTH

## NO. 02-11-00067-CV

CROSSTEX DC GATHERING
COMPANY, J.V.

APPELLANT

V.

TERRY TITUS BUTTON, OSSIE A.
BUTTON, T & O LEGACY, LTD.,
AND SOUTHWEST SECURITIES,
FSB, F/K/A FIRST SAVINGS BANK,
FSB

APPELLEES

----------

## FROM THE PROBATE COURT OF DENTON COUNTY

----------

## MEMORANDUM OPINION[1]

----------

Appellant Crosstex DC Gathering Company, J.V. condemned a portion of

land owned by Terry Titus Button and Ossie A. Button for purposes of a pipeline

---

[1]*See* Tex. R. App. P. 47.4.

easement.[2]  The Buttons objected to the commissioner's award, and the issue of damages resulting from the easement was tried to a jury.  Crosstex now appeals from the part of the trial court's judgment in condemnation awarding the Buttons $794,798.99 for damages to the remainder of their property resulting from the condemnation.  In two issues, Crosstex argues that the trial court's judgment should be reversed and a take-nothing judgment should be rendered on Appellees' remainder damages claim, or, alternatively, a new trial ordered or a remittitur suggested.  Because we hold that the evidence was not insufficient to support the jury's findings, we affirm the trial court's judgment.

**Background**

Crosstex attempted to purchase an easement from the Buttons in order to build a pipeline across their property.  When the parties could not agree on the value of the easement, Crosstex filed a suit in condemnation, seeking a permanent pipeline easement and a temporary construction easement.  Crosstex sued the Buttons and Appellee T & O Legacy, Ltd. (based on its asserted ownership interest under an unrecorded deed from the Buttons), as well as Southwest Securities, FSB (formerly known as First Savings Bank, FSB), which has a lien on the property (collectively the Buttons).  The petition asserted that after construction of the pipeline, the Buttons "shall have the full use and enjoyment of the land described in the easement, including . . . the right to lay out

_____

[2]At some point, the Buttons apparently deeded the property to T & O Legacy, Ltd., an entity they control.

2

and construct . . . utilities . . . across the easement, provided that any such utilities shall cross the easement at not less than a 45 degree angle to said pipeline." The petition stated that the Buttons would retain the right to use the land covered by the easement "for all purposes not inconsistent or conflicting with [Crosstex's] use of the easement for a natural gas gathering pipeline provided that [the Buttons'] activities do not endanger, obstruct, injure[,] or interfere with [Crosstex's] pipeline facilities."

The special commissioners appointed by the trial court assessed the Buttons' damages at $44,955.00. After the Buttons objected to the award, the case proceeded to trial. The parties stipulated that the only issues to be determined at trial were (1) the amount of money due to the Buttons for the taking of the temporary construction easement and permanent easement and (2) the damages, if any, to the remainder of the property as a result of the easement.

In discovery, the Buttons disclosed the identity of two expert witnesses they planned to have testify at trial: Jamie Wickliffe, an expert appraiser, and Jon Cross, an engineer. Crosstex filed pretrial motions to strike the testimony of both witnesses. As to Cross, Crosstex objected that his methodology was unreliable as he based his opinions on an incorrect assumption that Crosstex would not allow the Buttons to develop the area above the pipeline; he did not calculate any additional costs a developer might encounter in developing the property and therefore his opinion would not aid the jury in determining the damages; and he conceded in his deposition that there would likely not be any actual conflicts with

3

road crossings across the easements, rendering his opinion on that issue immaterial and irrelevant.

Crosstex objected to Wickliffe's testimony on the ground that she relied on Cross's opinion that "there is an area of conflict in a potential crossing are[a] along Copper Canyon Rd." Crosstex asserted that Cross testified in his deposition that there were no conflicts in the potential crossing areas, and he never calculated any additional costs a developer might encounter in developing the property. Crosstex argued that Wickliffe's "methodology is unreliable as there is an analytical gap between [Cross's] opinion that there is no potential conflict and [Wickliffe's] opinion [that] the remainder of the property is damaged."

Crosstex also objected that Wickliffe's testimony was unreliable and irrelevant because she presumed "that a portion of the subject property is available for zoning (i.e.[,] commercial) that is currently not available, nor likely to become available within reasonable probability under the local zoning ordinance."

After a hearing, the trial court overruled these objections, and both witnesses testified at trial. The jury found that the fair market value of the permanent easement was $124,530.96 and that damage to the remainder of the property was $665,968.03. The trial court valued the temporary easement at $4,300.00. The trial court rendered judgment in accordance with its finding and the jury's findings on damages, ordering that the Buttons be awarded damages

4

of $749,843.99 plus $44,955.00 that Crosstex had deposited into the registry of the court.

Crosstex filed a motion to modify the judgment or alternatively for new trial or for remittitur, asserting that the evidence was legally and factually insufficient to support the judgment awarding the damages for the remainder of the property. The trial court denied the motion, and Crosstex now appeals.

## Standards of Review and Law Regarding Expert Testimony

For an expert's testimony to be admissible, the testimony must be relevant and based upon a reliable foundation.[3] When ruling on a challenge to the reliability of an expert's testimony, courts "should ensure that the [expert's] opinion comports with the applicable professional standards."[4] An expert's opinion contains an "analytical gap" that undermines its reliability when the expert's opinion does not actually fit the facts of the case.[5]

A party complaining about the reliability of expert testimony must object to the evidence before trial or when the evidence is offered to preserve a complaint on appeal that the evidence is unreliable.[6] If the trial court overrules an objection to expert testimony, the opponent of the evidence may complain on appeal that

---

[3]*TXI Transp. Co. v. Hughes*, 306 S.W.3d 230, 234 (Tex. 2010).

[4]*Id.* at 235.

[5]*Id.*

[6]*Faust v. BNSF Ry. Co.*, 337 S.W.3d 325, 332–33 (Tex. App.—Fort Worth 2011, pet. denied).

the evidence is legally insufficient to support the jury's causation finding because the scientific evidence is unreliable and, thus, no evidence.[7] No objection is required for an appellant to argue that expert testimony is no evidence because it is conclusory or speculative.[8] Thus, when the objection is to an expert's methodology, and the trial court must therefore "'look[] beyond what the expert said' to evaluate the reliability of the expert's opinion," an objection is required. But no objection is required to argue on appeal that, on the face of the record, the testimony is conclusory and speculative and therefore lacks probative value because "there is no need to go beyond the face of the record to test its reliability."[9]

We may sustain a legal sufficiency challenge only when (1) the record discloses a complete absence of evidence of a vital fact; (2) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact is no more than a mere scintilla; or (4) the evidence establishes conclusively the opposite of a vital fact.[10] In determining whether there is legally sufficient evidence to support the

---

[7]*Id.*

[8]*Coastal Transp. Co., Inc. v. Crown Cent. Petroleum Corp.*, 136 S.W.3d 227, 232 (Tex. 2004).

[9]*Id.* at 233.

[10]*Uniroyal Goodrich Tire Co. v. Martinez*, 977 S.W.2d 328, 334 (Tex. 1998), *cert. denied*, 526 U.S. 1040 (1999); Robert W. Calvert, *"No Evidence" and "Insufficient Evidence" Points of Error*, 38 Tex. L. Rev. 361, 362–63 (1960).

finding under review, we must consider evidence favorable to the finding if a reasonable factfinder could and disregard evidence contrary to the finding unless a reasonable factfinder could not.[11]

When reviewing an assertion that the evidence is factually insufficient to support a finding, we set aside the finding only if, after considering and weighing all of the evidence in the record pertinent to that finding, we determine that the credible evidence supporting the finding is so weak, or so contrary to the overwhelming weight of all the evidence, that the answer should be set aside and a new trial ordered.[12]

## Analysis

In its first issue, Crosstex argues that there is no evidence to support the jury's finding of damages to the remainder of the property. In its second issue, Crosstex argues that the evidence is factually insufficient to support the jury's damages finding.

### A. Cross's Testimony

Crosstex makes two main complaints about Cross's testimony: (1) Cross's testimony was no evidence of damages because it was purely hypothetical and speculative, and (2) Cross's testimony related only to a theory of compensation—

---

[11] *Cent. Ready Mix Concrete Co. v. Islas*, 228 S.W.3d 649, 651 (Tex. 2007); *City of Keller v. Wilson*, 168 S.W.3d 802, 807, 827 (Tex. 2005).

[12] *Pool v. Ford Motor Co.*, 715 S.W.2d 629, 635 (Tex. 1986) (op. on reh'g); *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986); *Garza v. Alviar*, 395 S.W.2d 821, 823 (Tex. 1965).

impaired (but not substantially impaired) access to the property—that is not compensable under Texas law. We will address these arguments in turn. First, however, we will give an overview of Cross's testimony.

Most of Cross's testimony related to a set of requirements that Crosstex promulgated to regulate development over and around its pipelines. The document, titled "General Requirements for Crossing Crosstex Pipelines with Pipelines/Roads/Utility Lines" (Crossing Requirements), covers the general requirements for developing the property above, around, and adjacent to the pipeline. The requirements range in scope from limitations on landscaping over the easement to restrictions on blasting operations within five hundred feet of the pipeline. Cross went over the requirements, explaining what they meant so that the jury could understand them and discussing in what way each requirement would or would not cause a delay or added difficulty in developing the remainder property.

For example, the Crossing Requirements state that all utility lines or other underground facilities to be constructed across a Crosstex pipeline "must be installed with a minimum vertical separation of 24 inches between structures," that "[a]ll facilities crossing a Crosstex pipeline shall be made of, or encased in, steel pipe with threaded or welded joints the entire width of Crosstex's right of way," and that "[h]orizontal separations will be determined on a case-by-case basis." Cross testified that this requirement "creates a wall underneath the ground where you can't . . . take your utilities." He stated that in the absence of a

8

pipeline, such facilities are not normally required to be made of or encased in steel pipe. Cross stated that the "case-by-case basis" language "basically means" that Crosstex has the right "to tell you where to place your . . . utility." The document contains similar requirements for all underground electrical cables and for any underground fiber optic cables.

Another requirement provides that no paving may be placed on Crosstex's right of way without written permission from Crosstex. When paving is permitted, any proposed roads, streets, or driveways must be constructed with a minimum cover of forty-eight inches, including the subgrade. All other surfaces within the right of way must provide a minimum of thirty-six inches under the right of way. Any other paving—such as a parking lot—must be reinforced, not exceed four inches of thickness, be sectioned in ten-foot by fifteen-foot panels, contain lifting rings, and conform to the minimum cover requirements. Cross testified that restrictions provided by Crosstex "excludes any parking lot that [he's] ever seen" and that "[b]asically, it tells me that you can't build—you can't build a parking lot in our —in our easement is what that means to me, because you can't build a 4-inch thick parking lot." He stated that "it basically means [that] Crosstex has ultimate control over whether or not you place parking lots, roadways, driveways, alleyways, any paving on or over or across their—their easement."

Cross stated that as an engineer advising a buyer of that tract seeking to develop it, he would tell the potential buyer that "it means I may not be able to build my parking lot or my roadway or my driveway or my fire lane . . . where I

need to put it, or where it's best for my development." Cross also noted that any parking lot would have to be built in panel sections so that pieces of it could be removed as needed for access to the pipeline. He also noted that because any paving over the easement had to be reinforced, Crosstex is "basically dictating" that the paving be concrete. On cross-examination, Cross testified that these requirements can restrict the kind of development that can be done on the property. He mentioned that if the easement restricts the size of the parking lot that can be built, that has an effect on the size of the building you can construct because buildings, based on their use, require a certain number of parking spaces per square foot of building. He also referenced a development he had worked on as an example of a project in which the parking lot size had been restricted by the presence of a pipeline easement.

As for other structures on the easement, the Crossing Requirements state that "[n]o signs, monuments, building, structures, manholes, shrubbery, or trees shall be located within a Crosstex right of way and easement area," and no fence may be placed across the right of way without Crosstex's permission. If a fence is permitted, fourteen-foot gates must be installed on the right of way. Cross testified that the restriction "tells me I can't even plant trees or shrubs" in the easement area. Thus, any potential developer of the remainder property would face the possibility of putting no landscaping, no fencing, no driveways, no parking lots, and no other paving over the easement, and would have to consider

what kind of development could work on the property with those kinds of restrictions.

Cross stated that pipeline companies can be difficult to work with and that when a developer brings him more than one property to develop, he typically suggests that "they can find a similar property without the gas pipeline easement . . . because of the unknowns, like control, that they may have in developing around the gas pipeline easement." Cross testified that to some degree, gas pipelines like the Crosstex line always cause problems for development.

A civil engineer experienced in site and land development projects, Cross explained to the jury what these requirements would entail for anyone wishing to develop the property in any manner. His testimony was not limited to any particular kind of development—for example, what difficulties someone subdividing the property into lots would face. Instead, he testified to how the restrictions would or would not add complications to development of *any* kind.

Keeping the above in mind, we now turn to Crosstex's arguments about Cross's testimony. We begin with Crosstex's argument that Cross's testimony was no evidence of damages because it was entirely speculative.

1. **Whether Cross's testimony is speculative and impermissibly based on hypothetical subdivisions.**

Crosstex points out that because the property has no improvements on it, Cross could not testify to problems that the condemnation caused to any existing development, and therefore testimony about any problems a developer might

11

have is purely hypothetical.  And, Crosstex argues, because Cross's testimony was based on hypothetical development plans it cannot form the basis of a reliable expert opinion, and because his testimony was nothing more than speculation and conjecture as to possible future land development, "untethered to any real development plan," it was no evidence at all.

Crosstex is correct that testimony that is too speculative is unreliable and should not be admitted by the trial court.[13]  And in many circumstances, testimony about hypothetical developments is no evidence from which a jury may make determinations about market value.[14]  But all valuation opinion involves some level of speculation.[15]  The question here is what kind of valuation

_____

[13]*Exxon Pipeline Co. v. Zwahr*, 88 S.W.3d 623, 629 (Tex. 2002) (stating that evidence is unreliable if it is no more than unsupported speculation).

[14]*See, e.g., City of Austin v. Cannizzo*, 153 Tex. 324, 335, 267 S.W.2d 808, 816 (1954) (holding that, in a condemnation trial respecting 4.57 acres of unimproved land, "prices paid for improved lots and the value assigned to improved lots in recent sales is not admissible" for failing the test of similarity and that "[o]pinion testimony as to the front[-]foot value of nonexistent lots in a hypothetical subdivision is too speculative to be admitted as direct evidence of market value"); *see also State v. Willey*, 360 S.W.2d 524, 525 (Tex. 1962) (citing *Cannizzo* and holding that, in a condemnation trial respecting three acres of unimproved land, Willey could not "show what the price of the lots would be if [the land were] subdivided").

[15]*Tex. Pipe Line Co. v. Hunt*, 149 Tex. 33, 40–41, 228 S.W.2d 151, 155–56 (1950) (noting that the issue of depreciated market value is largely a matter of opinion evidence and that all opinion is "at best something of a speculation"); *LaSalle Pipeline L.P. v. Donnell Lands, L.P.*, 336 S.W.3d 306, 315 (Tex. App.— San Antonio 2010, pet. filed) (stating that, "[a]s the Texas Supreme Court has recognized [in *Hunt*], all appraisal opinion is at best something of a speculation").

testimony is reliable, probative evidence of market value and what is not and in which category Cross's testimony best fits.

One method for establishing the market value for property is the comparable sales approach under which the appraiser (1) finds data for sales of similar property and then (2) adjusts those sales prices up or down based on differences between those properties and the property being valued.[16] Comparable sales must involve land with similar characteristics.[17] A trial court should refuse to admit a sale as comparable "if the comparison is so attenuated that the appraiser and the fact-finder cannot make valid adjustments for these differences."[18]

Crosstex is correct that when the property being valued is undeveloped, "one seeking to prove the value of such a tract of land may not show what the price of the lots would be if subdivided, or show the price for which already subdivided lots were selling."[19] This kind of evidence fails for two reasons: such evidence "tends to cause the jury to value the land as lots, presumably at a

---

[16]*City of Harlingen v. Estate of Sharboneau*, 48 S.W.3d 177, 182 (Tex. 2001).

[17]*Id.*

[18]*Id.*

[19]*Willey*, 360 S.W.2d at 525.

higher market value,"[20] and the sales price of individual, improved lots does not meet the test of similarity.[21] In other words, property that has been subdivided into lots is too dissimilar to undeveloped property, rendering a comparison too attenuated for the appraiser to make valid adjustments for the differences between the properties, and a jury might assign more value to an undeveloped property than its actual market value when presented with plans of hypothetical lots. Thus, a party who wants to establish the market value of an undeveloped tract of land may not do so by drawing up hypothetical plans of nonexistent subdivisions and then developing an opinion about the market value for the tract based on what those individual hypothetical lots could sell for.[22] A party may, however, testify about the adaptability of a particular property for use as a subdivision.[23]

---

[20] *Boswell v. Brazos Elec. Power Co-op., Inc.*, 910 S.W.2d 593, 601 (Tex. App.—Fort Worth 1995, writ denied); *see also Lower Nueces River Water Supply Dist. v. Collins*, 357 S.W.2d 449, 452 (Tex. Civ. App.—San Antonio 1962, writ ref'd n.r.e.) ("[W]here the property condemned is raw acreage it is not proper to admit in evidence hypothetical plats of nonexistent subdivisions, the reason being that they tend to cause the jury to value the land as lots.").

[21] *Cannizzo*, 267 S.W.2d at 816; *see also Sharboneau*, 48 S.W.3d at 187 (Baker, J., concurring).

[22] *Boswell*, 910 S.W.2d at 601; *see also Collins*, 357 S.W.2d at 452 ("Opinion testimony as to the value must be based upon the value of the land as an entirety and not in parcels, unless there is some reason to value it in parcels, such as differences in the nature of the land.").

[23] *Boswell*, 910 S.W.2d at 602.

Evidence of factors affecting the marketability of property is admissible for establishing damages in condemnation suits. For example, fear of a proposed pipeline in the mind of the public may be relevant to a determination of the market value of taken property.[24] The perception that potential future annexation of property could limit the property's use is another example of a circumstance that may be properly considered in assessing the current value a willing buyer and seller would place on the property.[25]

Although Crosstex points out the rule in condemnation valuation cases that "[e]vidence should be excluded relating to remote, speculative, and conjectural uses, as well as injuries, which are not reflected in the present market value of the property," that is only part of the rule.[26] The Supreme Court of Texas has also said that generally, it is proper to admit evidence "upon all such matters as suitability and adaptability, surroundings, conditions before and after, and all

---

[24] *See Heddin v. Delhi Gas Pipeline Co.*, 522 S.W.2d 886, 888 (Tex. 1975) (stating that fear of a proposed pipeline is relevant to a determination of damages in a condemnation suit when there is a basis in reason or experience for the fear; such fear enters into the calculation of persons who deal in the buying and selling of similar property; and there is depreciation of market value because of the existence of such fear); *Stinson v. Arkla Energy Res.*, 823 S.W.2d 770, 771 (Tex. App.—Texarkana 1992, no writ) (same); *see also Hunt*, 149 Tex. at 41, 228 S.W.2d at 156 (noting that the supposition that market value might be adversely affected by the existence of the pipeline is not unreasonable).

[25] *State v. Ledrec, Inc.*, 366 S.W.3d 305, 311 (Tex. App.—Fort Worth 2012, no pet.).

[26] *State v. Carpenter*, 126 Tex. 604, 615, 89 S.W.2d 194, 200 (1936) *disapproved of in part on other grounds by State v. Meyer*, 403 S.W.2d 366 (Tex. 1966).

circumstances which tend to increase or diminish the present market value."[27]  It is only remote, speculative, and conjectural uses that are not reflected in the property's value that should be excluded.

If Cross's testimony, then, were of remote or speculative future uses or future injuries that would not be reflected in the market value of the property at the time of the taking, then it should have been excluded.  But Cross's testimony related to real circumstances—the additional complications that arise when developing around a pipeline and the manner in which Crosstex exercises its rights under its easements.  Cross's testimony that a buyer would have to consider the pipeline's presence and Crosstex's easement in deciding to what use the property could be put is not mere speculation.  This testimony related to factors that a willing buyer and willing seller would consider in determining the market value of the property at the time of the taking.  To the extent that these circumstances affect the property's marketability and would be reflected in the property's market value, the testimony was relevant.

Cross did not give an opinion on the market value of the property, did not testify about a hypothetical subdivision plan, and did not attempt to compare the unimproved property with improved property.  The cases prohibiting testimony

---

[27] *Id.*; *see also Gulf Coast Irrigation Co. v. Gary*, 118 Tex. 469, 480, 14 S.W.2d 266, 271 (1929) ("[W]hen the whole of the tract is not taken, . . . the kind and character of easement condemned, and the manner in which the rights of the condemnor are to be exercised and maintained, and the rights and privileges left in the owner, may properly be taken into consideration in assessing the damages.").

about using the market value of hypothetical subdivisions to prove the market value of unimproved land are simply not applicable to Cross's testimony.[28] His testimony was not the kind of hypothetical speculative development testimony prohibited by Texas law.

Crosstex argues that Cross drew up hypothetical development plans and then testified about three hypothetical driveways in order to show damage to the remainder. But Cross only testified about the plans and the driveways when asked about them on cross-examination. That was not the focus of his testimony. And his testimony with respect to those plans was that the plans were only drawn up as examples. He did not base a conclusion about damages or even about development difficulties for the remainder property on those plans.

Crosstex relies in part on *State v. Delaney*, in which the Supreme Court stated that "while condemned property may be appraised at its highest and best use, remaining property on which there are no improvements and to which reasonable access remains, is not damaged simply because hypothetical development plans may have to be modified."[29] *Delaney* is readily distinguishable, however. In *Delaney*, landowners sued the State for inverse condemnation, claiming that the State's removal of a road abutting their property

---

[28] *See Sharboneau*, 48 S.W.3d at 183 ("Because Mrs. Sharboneau did not offer evidence of individual lot sales as comparable to her own undivided property, [her expert's] testimony is not precluded by *Willey* and *Cannizzo*.").

[29] *State v. Delaney*, 197 S.W.3d 297, 300 (Tex. 2006) (citation omitted).

17

caused substantial and material impairment of access to their property.[30] The *Delaney* court reiterated its previous holding in *Santikos* that, with respect to unimproved property, "an impairment claim cannot be sustained on the basis that 'someday a developer might want to build a driveway at the single most difficult and expensive location on the entire property.'"[31] *Delaney* does not stand for the proposition that a landowner may *never* recover for damages to unimproved property based on problems for and restrictions on development created by a taking and affecting the property's market value.

Crosstex also points to *Dawmar Partners*[32] for the proposition that appraisal testimony cannot be based on speculative or hypothetical uses, and to *Carpenter*[33] for the proposition that evidence of remote, speculative, and conjectural uses should be excluded. *Dawmar Partners* is another impairment of access case. The Supreme Court, as it had in *Delaney*, once again held that a landowner may not recover for impairment of access based on speculative or hypothetical uses of unimproved remainder property.[34] The court held that the restrictions of access in that case "resulted only in increased circuity of travel,

---

[30] *Id.* at 298–99.

[31] *Id.* at 298 (citing *County of Bexar v. Santikos*, 144 S.W.3d 455, 460–61 (Tex. 2004)).

[32] *State v. Dawmar Partners, Ltd.*, 267 S.W.3d 875, 880 (Tex. 2008).

[33] *Carpenter*, 89 S.W.2d at 200.

[34] *Dawmar Partners*, 267 S.W.3d at 879.

18

which this Court has repeatedly held is not compensable."[35]  But like *Delaney*,

*Dawmar Partners* does not stand for the proposition that a landowner may never

recover for damages to unimproved property based on a decrease in market

value because of potential difficulties in development resulting from the taking.

As argued by Crosstex and as stated above, the *Carpenter* court stated

that "[e]vidence should be excluded relating to remote, speculative, and

conjectural uses, as well as injuries, which are not reflected in the present market

value of the property."[36]  But in the immediately previous sentence, the *Carpenter*

court stated that "[g]enerally, it may be said that it is proper as touching the

matter of the value and depreciation in value to admit evidence upon all such

matters as suitability and adaptability, surroundings, conditions before and after,

and all circumstances which tend to increase or diminish the present market

value."[37]  So although evidence is to be excluded if it is entirely speculative and

"not reflected in the present market value of the property," evidence in

condemnation cases is not restricted to only the use to which the land is currently

being put.  Evidence of the property's condition and adaptability that would

---

[35]*Id.* at 880.

[36]*Carpenter*, 89 S.W.2d at 200.

[37]*Id.*; *see also State v. Windham*, 837 S.W.2d 73, 77 (Tex. 1992) ("In deciding market value the jury is permitted to consider all of the uses to which the property is reasonably adaptable and for which it is, or in all reasonable probability will become, available within the foreseeable future.").

increase or decrease the present market value of the property is, generally speaking, properly admissible.[38]

We also point out that another case cited by Crosstex, *Cannizzo*,[39] does not bar the kind of testimony offered by Cross. In *Cannizzo*, the landowners were not offering evidence valuation of the property based on what it would sell for to a developer who hoped to subdivide the property at some point in the future. The landowners there "were seeking valuation of their property *as if it were* a developed, primarily residential subdivision."[40] In our case, the landowners are not seeking valuation of their property as if it were already subdivided as in *Cannizzo*. Instead, they produced testimony about the value of the property to a developer who would take into consideration the uses to which the property could reasonably be put.

In summary, Crosstex argues that because the land is currently undeveloped, Cross's testimony about problems a developer would face are impermissibly hypothetical. But even Crosstex's own expert agreed that the highest and best use of this property is a blend of residential and commercial development. That means that the market value of the property should be determined giving consideration to what a willing buyer would pay for the

[38] *Carpenter*, 89 S.W.2d at 200.

[39] *Cannizzo*, 267 S.W.2d at 816.

[40] *See In re State*, 355 S.W.3d 611, 616 (Tex. 2011) (discussing *Willey* and *Cannizzo*) (orig. proceeding) (emphasis added).

20

property for that use.[41]    But Cross's testimony was evidence that any development over or near the easement would face complications because of Crosstex's pipeline and easement.  If a developer wants to build a driveway, parking lot, or any other kind of paving over the easement; landscape over the easement; run utilities around the pipeline; or put a fence across the easement, the developer has to address Crosstex's requirements.  In this case, a statement as to what actual use the land will ultimately be put by a hypothetical buyer is speculative.  But Cross's testimony, which related to the fact that development will be more complicated and development options more limited because of the pipeline, is not.

Because the prohibition on speculative testimony and on value testimony based on hypothetical subdivision plans does not bar Cross's testimony, we overrule this part of Crosstex's first issue.

2. **Whether Cross's testimony was no evidence because it only supported a claim of impaired access.**

Crosstex next argues that the damages asserted by the Buttons through Cross's testimony relates to impaired access to the property, which is an injury that is not compensable under Texas law unless the access is substantially impaired.  As Crosstex points out, damages that result merely from traffic being required to travel a more circuitous route to reach the condemnee's property are

---

[41] *See Carpenter*, 89 S.W.2d at 200.

21

not compensable.[42]  We would therefore agree with Crosstex's argument if Cross testified merely that any potential developer would have to design plans such that the driveway did not run across the pipeline and therefore an impairment existed to accessing the remainder property.  Because there was no evidence produced by the Buttons that there would be no other way to access the remainder property except over the pipeline, they did not establish substantial impairment to the remainder.  So if, as Crosstex claims, their theory of damages was based on impaired access, there would be no evidence of damages.  But Crosstex is not correct that the Buttons' theory of damages was access impairment.

As stated above, the Buttons argued that because of the pipeline and easement, development of the remainder property would be more complicated and that even though part of the property had a highest and best use for commercial development, the market potential for commercial development had been negatively affected by the easement, and the market value of the property was decreased thereby.  Because the Buttons damages theory and Cross's testimony did not hinge on impaired vehicle access to the property, we overrule this part of Crosstex's first issue.

---

[42] *State v. Bristol Hotel Asset Co.*, 293 S.W.3d 170, 174 (Tex. 2009) (quoting *State v. Wood Oil Distrib., Inc.*, 751 S.W.2d 863, 865 (Tex. 1988)).

## B. Wickliffe: Appraisal Testimony

The second part of Crosstex's first issue is that Wickliffe's testimony is no evidence of damages. Crosstex raises three main complaints related to Wickliffe's testimony: (1) Wickliffe's reliance on Cross's testimony fatally undermines her own testimony; (2) Wickliffe's analysis improperly assumed a change in use and zoning that was unsupported by and inconsistent with known evidence; and (3) Wickliffe's comparative-sales analysis is unreliable and irrelevant.

In some of its arguments, Crosstex complains about the underlying data to support Wickliffe's valuation opinion. The Supreme Court once held the view that "[w]hile lack of supportive market data would tend to diminish the reliability of expert testimony, such goes to the weight and not the propriety of evidence."[43] In more recent cases addressing reliability and expert testimony, the Supreme Court has indicated that examination of the facts underlying an expert's opinion is a part of determining the reliability of the expert's opinion.[44] At least one court of appeals has relied on *Wheeler* to hold that to the extent lack of market data would affect the reliability of an expert's appraisal opinion, it does not necessarily

---

[43] *Tex. Elec. Serv. Co. v. Wheeler*, 551 S.W.2d 341, 342–43 (Tex. 1977).

[44] *See, e.g.*, *Ford Motor Co. v. Ledesma*, 242 S.W.3d 32, 38–39 (Tex. 2007) (stating that an expert's testimony must have a reliable foundation to be admissible); *Mack Trucks, Inc. v. Tamez*, 206 S.W.3d 572, 579 (Tex. 2006) ("In determining reliability, the trial court 'should undertake a rigorous examination of the facts on which the expert relies.'") (citation omitted).

make the data inadmissible.[45]  We need not determine whether a lack of market data to support a valuation opinion makes an opinion too unreliable to constitute admissible evidence because the arguments Crosstex raises about the reliability of Wickliffe's valuation testimony relate to whether the testimony constitutes sufficient evidence to support the jury's verdict and not to whether the evidence should have been admitted in the first place.

1.  **Whether Wickliffe's reliance on Cross's testimony undermines her testimony.**

Crosstex argues that Wickliffe's reliance on Cross's irrelevant and unreliable testimony fatally undermines her own testimony.  It is unclear to what extent, if any, Wickliffe used Cross's report in formulating her opinion.[46]  But to the extent Wickliffe used Cross's report in forming her valuation opinion, she could have correctly used his report as part of an assessment of what value a willing buyer would place on the remainder because of the perception that Crosstex's easement could limit the property's use.  An expert may consider the property's potential for future uses as well as the perception of the property's potential for future uses in determining what a willing buyer would consider in

---

[45]*McKinney Indep. Sch. Dist. v. Carlisle Grace, Ltd.*, 222 S.W.3d 878, 882 (Tex. App.—Dallas 2007, pet. denied).

[46]*See* 2 R.R. 134-35, 138; 4 R.R. 220, 248-51.  The language from Wickliffe's testimony that Crosstex quotes in its brief that Cross's analysis "was part of what made up [her] opinion" was in answer to a question from Crosstex about her opinions formed in other cases, not this one.  *See* 4 R.R. 250.

deciding whether to buy a property and for how much.[47]  And because we have determined that Cross's testimony was not irrelevant and unreliable for the reasons asserted by Crosstex, its argument here is unpersuasive.  We overrule this part of Crosstex's first issue.

## 2. **Whether Wickliffe's analysis improperly assumed a change in use and zoning unsupported by evidence**.

In support of this argument, Crosstex first contends that Wickliffe assumed a change in the use and zoning of the property in order to inflate the calculation of damages to the remainder and that the gap between the evidence presented at trial and her highest and best use assumptions was so great as to make her conclusions no evidence.  Crosstex argues that in considering highest and best use, speculative and hypothetical uses cannot be considered, and there was no evidence of any current or proposed development on the property.  Wickliffe nonetheless valued the property as mixed residential and commercial use, changing the zoning on twenty-six acres of the tract from residential to

---

[47] *See Ledrec*, 366 S.W.3d at 311 (holding that an expert's testimony was not based on a speculative or remote possibility—specifically, what value the property would have in the future at the time of a future annexation—but instead was based on an assessment of the *current* value a willing buyer and seller would place on the remainder property as of the date of taking because of the perception that annexation could limit the property's use); *see also Interstate Northborough P'ship v. State*, 66 S.W.3d 213, 221 (Tex. 2001) (discussing *State v. Schmidt*, 867 S.W.2d 769 (Tex. 1993), and holding that the condemnee's complaint about how the condemnor's use of the condemned property affected the remainder property gave rise to compensable damages).

commercial even though there was no official act of any governmental body implying that these acres would at some point in the future be zoned commercial.

We first point out that Crosstex's expert agreed with Wickliffe that the highest and best use for the property was a mix of residential and commercial development. So although Crosstex argues in its brief that the Buttons needed to rebut the presumption that leaving the land undeveloped was its highest and best use and that they failed to do so, this argument is unpersuasive because its own expert agreed with Wickliffe. Thus, the testimony at trial supported Wickliffe's assertion that the property's highest and best use was a mix of residential and commercial development. As both sides agreed that development was the highest and best use for the property, it was not improper for Wickliffe to develop on opinion on the basis that such development was the property's highest and best use. The only dispute on this point, then, was not over whether the highest and best use for the Buttons' property was as developed property but over how much of the Buttons' property had a highest and best use as commercial development as opposed to residential.

We therefore turn to Crosstex's argument that twenty-six of the fifty-two acres of the Buttons' property that Wickliffe valued as commercial property were zoned as residential at the time of the taking and that Wickliffe "upzoned" these acres with no basis for doing so. Crosstex argues that for all twenty-six acres that Wickliffe "upzoned," she provided "no actual or specific evidence demonstrating a probability of a zoning change." Crosstex further argues that

there was no evidence of an actual need for more commercial zoning, no evidence of any current plans to develop the property, and no temporal evidence that any change in zoning would occur in the near future.

Wickliffe based her market value opinion on the assumption that 26.26 acres of the property could be zoned commercial in addition to the 25.83 acres were already zoned that way. Approximately fourteen of the twenty-six acres were included in the city's future land use plan as zoned for commercial use. The remaining twelve acres "upzoned" by Wickliffe were not included as commercially zoned in the future land use plan.

The record shows that Wickliffe did not value the twenty-six acres as though commercial zoning were already in place at the time of the taking. She valued that property "not as if the zoning was in place but as if it [were] reasonably probable for the zoning to be obtained." That is, she determined the market value of the property considering the probability that a buyer could obtain commercial zoning on that part of the property in the near future and the effect that this probability had on the property's value. She specifically noted that in her appraisal, she valued the property at a lower value than she would have if the zoning were already in place.

The Supreme Court has stated that it "is a matter of common knowledge that cities frequently lift zoning ordinances or reclassify property in particular zones when the business or wants of the community justifies that type of action

in the interest of the general public welfare."[48]  Thus, "if it appears reasonably probable to the trial judge that the wants and needs of the particular community *may* result, within a reasonable time, in the lifting of restrictions, [the judge] should admit testimony of present value based on prospective use of the property for purposes not then available."[49]  So in this case, if it was reasonably probable that the property's zoning could be changed to commercial within a reasonable time, then Wickliffe properly considered that possibility and the effect it would have on the property's value.[50]

In its brief, Crosstex argues that the Buttons produced "no actual official documents that supported [Wickliffe's] change of use" and "did not testify to any specifics of her conversations with others, and . . . did not testify that any city official actually stated that a zoning change would likely take place."  It points out that its own expert testified that the people he spoke with at the city "indicated [that] there was nothing in the works for any additional commercial zoning there and that they did not anticipate any" and that he asked them if "they were aware

---

[48] *Cannizzo*, 267 S.W.2d at 815.

[49] *Id.* (emphasis added).

[50] *See id.* at 814 ("When[,] however[,] a particular use of property is prohibited or restricted by law, but there is a reasonable probability that the prohibition or restriction will be modified or removed in the near future, *the effect of such probability upon the value of the property may be taken into consideration.*" (emphasis added)).

28

of anything anticipated or whether they felt like that . . . might occur, and the answer was no."

This valuation situation was not one in which the entire property was, for example, residential, and Wickliffe claimed that the highest and best use was commercial even though nothing indicated that the landowner would be able to get approval for rezoning and the facts actually suggested the opposite. In this case, part of the property is *already* zoned commercial, and the question is whether Wickliffe's opinion is unreliable because she concluded from the facts that a buyer and seller would contemplate that an additional twelve to twenty-six acres of the property could be approved for commercial zoning in the reasonably foreseeable future and whether she had information from which she could reach that conclusion. We must also note that the testimony at trial suggested that part of the property that Wickliffe "upzoned" was in the easement, and Crosstex expressly does not complain about the value of the easement on appeal. Crosstex apparently then only takes issue with the part of the "upzoned" property that was not in the easement.

Although Crosstex takes issue with the fact that Wickliffe had no official commitment for approval of rezoning already in place and that no definite development plans existed, we do not agree that the case law requires a testifying expert to make this kind of showing. The cases that include language even close to that effect are distinguishable. For example, in *Dawmar Partners*, the Supreme Court pointed out that "the property is zoned for residential use, and

29

there is no evidence of a pending request for a zoning change, existing commercial development plans, or a contract for commercial use."[51]  But, again, *Dawmar Partners* is a denial-of-access case, and this statement was made in connection with the court's conclusion that "[t]his case . . . lacks evidence of a material and substantial impairment of access."[52]  The court pointed out that the property's unimproved state, with no development plans in the works and with access to the property from two other roads, refuted any suggestion that the remainder property had been damaged because access to one side of the property was impaired.[53]  Thus, we look at Wickliffe's testimony about why she "upzoned" twenty-six acres not to see if she rebutted the presumption that the property's highest and best use was to leave it undeveloped but to see if it supports her valuation opinion of the property based on its value as property that can be developed.  The question here was how much of the property could an expert consider as having a reasonable probability of obtaining commercial zoning in the reasonably foreseeable future for purposes of determining what the market value of the property is.

We also disagree that the law requires specific temporal evidence of when a suggested zoning change will occur.  We do not believe the "near future"

---

[51]*Dawmar Partners*, 267 S.W.3d at 880.

[52]*Id.* at 879.

[53]*Id.*

language of *Zwahr*[54] and *Cannizzo*[55] relied on by Crosstex sets up a different rule than the "foreseeable future" and "reasonable time" language used elsewhere.[56] We do not believe that the law required the Buttons to produce temporal evidence showing exactly what time frame a change of zoning would definitely occur or for that matter that it provides any specific guidance on what time frame the phrase "near future" encompasses. And we point out that in nuisance cases, the Supreme Court has acknowledged that "estimates of market value normally rest on expectations not about future days but about future years."[57]

---

[54]*Zwahr*, 88 S.W.3d at 628 ("The existing use of the land, in this case, cotton farming, is its presumed highest and best use, but the landowner can rebut this presumption by showing a reasonable probability that when the taking occurred, the property was adaptable and needed or would likely be needed in the near future for another use.").

[55]*Cannizzo*, 267 S.W.2d at 814 (stating that uses may be considered even if that use on the property is restricted by law when there is "a reasonable probability that the prohibition or restriction will be modified or removed in the near future").

[56]*See, e.g.*, *Windham*, 837 S.W.2d at 77 (stating that "[i]n deciding market value the jury is permitted to consider all of the uses to which the property is reasonably adaptable and for which it is, or in all reasonable probability will become, available within the *foreseeable future*" (emphasis added)); *Cannizzo*, 267 S.W.2d at 815, stating that "if it appears reasonably probable to the trial judge that the wants and needs of the particular community may result, within a *reasonable time*, in the lifting of restrictions, he should admit testimony of present value based on prospective use of the property for purposes not then available" (emphasis added)).

[57]*Schneider Nat'l Carriers, Inc. v. Bates*, 147 S.W.3d 264, 277 (Tex. 2004) (noting also that market values usually reflect expectations about future years "but not future centuries").

31

To see if Wickliffe provided evidence to support her conclusions, we have reviewed the record. In her summary report, Wickliffe stated that she had conducted interviews with the mayor of Copper Canyon and the city director, and in both interviews the official "indicated that the Town[58] would be favorable to the expansion of the PD-1[59] zoning to include a significant portion of the adjoining northern land including frontage along Copper Canyon Rd." She stated that the officials told her that "the City would most likely be favorable to expanding this PD-1 zoning to include the Copper Canyon Rd. frontage as far north as [the] northwesterly bend in the road" and that after analyzing the information she learned in those interviews as well as the future land use map, she formed an opinion that "it is reasonable to conclude that additional PD-1 zoning will be available for expansion to include a significant portion of the northern adjoining land and a significant portion of the land fronting Copper Canyon Rd. in the reasonably foreseeable future."

The trial court conducted a pretrial hearing on Crosstex's objections to Wickliffe's testimony. There, Crosstex's attorney and the trial court questioned Wickliffe about how she reached her opinion that there was a reasonable probability of the zoning changing. She pointed out that of the additional twenty-

---

[58]In her report, Wickliffe sometimes describes Copper Canyon as a town and sometimes as a city.

[59]In her report, Wickliffe stated that Copper Canyon describes PD-1 zoning as a "district that is to provide for a variety of land uses in a human-scaled and pedestrian-friendly public environment. These uses include retail and office."

six acres she thought would change zoning, about fourteen acres had been included as commercial usage in Copper Canyon's future land use plan.

Wickliffe stated that she had a copy of an email that the town administrator had written in which the administrator referred to the area she "upzoned" as the "Copper Canyon Development Corridor" . . . "for commercial purposes." The Buttons' attorney asked her about this email, suggesting that it was an email written in response to an application by the Buttons to have the zoning on their entire property changed to commercial. The attorney asked if this was the email in which the official told the Buttons essentially that "we don't think it would be even in your best interest" to have the entire property zoned as commercial, but if the Buttons would resubmit a survey on seventy-five acres, he did not think rezoning that much of the property would be an issue because the area was along the "Copper Canyon Development Corridor." Wickliffe agreed that there were references to "that Copper Canyon Corridor and discussions with City administrators regarding the potential for even more zoning than what I had purported in my highest and best use" and that she had confirmed this information with city officials. Crosstex's attorney asked her if the application had been denied, but Wickliffe stated that in fact the Buttons had pulled their application because the city was in the process of "firming up" its "long-range master plan" and "because of the pipeline and all that was going on with the property," and so the Buttons had decided not to go through the expense of the survey on seventy-five acres that would have been required for the application.

Wickliffe stated that she spoke to the person who was the city administrator at the time she began her investigation, the successor city administrator, the mayor, and some city council members, all of whom gave her the understanding "that Copper Canyon Road was being purported to be some kind of a commercial corridor, at least for a certain depth." She confirmed that to her knowledge, the city had never taken any action or position adverse to commercial zoning in the area she had "upzoned." Wickliffe concluded from her interviews that "there's no reason to believe that it would be opposed by anyone in the government or otherwise. So the surrounding property owners or the government, everything we have is an indication that that is reasonably probable within the reasonably foreseeable future." And in forming her opinion as to market value, she "discounted what those kinds of uses would sell for to account for the risk associated with the fact that the zoning was not in place."

At the conclusion of the hearing, the trial court summarized the testimony on the issue of "upzoning" as follows:

> Here you have a lot of supporting activity by the City. You have master plans released for public use and public reliance that at least cover portions of the property that is relied upon by this appraiser as being commercial-use property. You do not have . . . an ordinance passed by the City prior to the date of take that imposes some sort of requirement adverse to this conclusion made by Ms. Wickliffe. You have only actions that would tend to corroborate or support and on which a qualified licensed professional real estate appraiser might rely.

Then at trial, Wickliffe provided background information for the jury. She told the jury that for part of the property she had "upzoned," the city had included

34

that property as future commercial property in its future land use plans, and through interviews, city officials and staff had indicated that "certainly this Future Land Use Plan would be followed." Regarding the rest of the "upzoned" property, she stated that

> In my conversations with the community and looking at the development patterns that I had seen in the area and reading several of their documents, it appeared to me that they planned on this Copper Canyon roadway having at least some portion of the property proposed to be a corridor-type zoning, a smaller commercial area of zoning, kind of along the frontage of the roadways, to create some additional tax dollars to help support the residential growth in the area.

> Copper Canyon is a fairly small community, and its opportunities for commercial development are fairly limited to those areas that are on existing corridors that make some sense and have some availability of utilities.

> Combination of those things, along with the fact that the property owner themselves had inquired about the possibility of zoning a larger area than what I've purported to be commercial, led me to the conclusion that the right way a buyer would look at this property in the marketplace would be to assume that [the "upzoned" area] would be utilized for some type of commercial use.

Wickliffe also told the jury that she had spoken with the former city administrator about the city's master planning process and "the concepts of other types of zoning on the property," that she had talked to the current city administrator who "has carried the City through . . . some of those rezoning processes and [has] been overseeing the City's Future Land Use Plan for a while," that she had spoken with the mayor and council members "to get a feel for what the political atmosphere was," and that she had talked to market

35

participants, "the buyers and sellers out in the marketplace, people that had signs for sale, properties for sale up and down the roadway, or people that had bought property in the area, to talk with them about what the general atmosphere was in the neighborhood." From these conversations, Wickliffe drew her opinion about the probability of commercial zoning on the additional twenty-six acres of the Buttons' property.

For the approximately fourteen acres that was included in the city's future land use plan, we cannot conclude that Wickliffe's opinion about the value of the property was so unsupported by and inconsistent with known evidence so as to render the opinion no evidence. Under the facts of this case, and considering that the city has publicly stated that its goal is to rezone this part of the property to commercial use in the future, it is reasonable to assume that the city would approve a request for a zoning change to commercial on that property. It is also reasonable to assume that a willing buyer would consider that information in deciding whether to buy the property and at what price and that a willing seller would consider that information in determining for what price to sell. And Wickliffe indicated that it is common for a buyer to buy property with desired zoning not in place but with the anticipation of obtaining the necessary zoning change, and that a property with the zoning already in place would have a higher price than property on which a zoning change was anticipated. Considering that Wickliffe determined her value for the property not as if the property had that zoning in place at the time of the taking but what the property would sell for given

36

a reasonable probability that it would have that zoning in the reasonably foreseeable future, we cannot say her opinion was unreliable and therefore no evidence on this basis.[60]

Regarding the remaining twelve acres that Wickliffe "upzoned," we again cannot conclude that her opinion was no evidence of damages. She talked to city officials and city staff, all of whom indicated that the city would be open to rezoning the amount she included as future commercial property. Her market research indicated that the city has limited space for commercial property and that the area at the time of the taking was growing. Every indication Wickliffe had was that the city was supportive of rezoning the property for commercial use and that the community had a market for the property as commercial. Given the information on which Wickliffe relied, we conclude that Wickliffe's opinion that there was a reasonable probability that the additional twelve acres would be zoned commercial in the reasonably foreseeable future and that a buyer would pay more for the property on that basis did not make her value opinion unreliable.[61]

---

[60]*See Cannizzo*, 267 S.W.2d at 815; *Carlisle Grace, Ltd.*, 222 S.W.3d at 884–85 (describing the basis for an expert's testimony about the feasibility of residential development for the property, which included testimony that the city's comprehensive plan for the property showed future land use of the property as low density residential).

[61]*See Carlisle Grace, Ltd.*, 222 S.W.3d at 884–85 (stating that "the law does not require Carlisle Grace to show that the use had already been approved" and noting that "that the City's comprehensive plan for the property showed

Crosstex points out that its expert testified that he spoke with city officials, who confirmed that nothing was "in the works" for changing the zoning on the property and that they did not anticipate any, but that testimony does not make Wickliffe's conclusion unreliable. Jurors may believe one expert and not the other, and the fact that no plans were "in the works" to change the zoning is not evidence that the city would be opposed to rezoning the property.[62]

We recently addressed expert testimony about future government action in *State v. Little Elm Plaza, Ltd.*[63] That case dealt with testimony that a government would take an action respecting a property in the future and how that action would injure the landowner.[64] We do not have the same kind of testimony in this case. And in *Little Elm*, we observed that in this court, we draw a distinction between two types of expert testimony about future government action:

> [A]n expert may testify about how an uncertainty with regard to a governmental action may have affected the market value (in other words, how potential buyers and sellers would weigh the risks related to the property) on the date of the taking, but an expert may not opine about how that uncertainty will actually be resolved in a date after the taking when that opinion is speculative or conjectural.

future land use of the property as low density residential," the same highest and best use determined by the appraiser).

[62]*See City of Keller*, 168 S.W.3d at 819 (stating that jurors are the sole judges of the credibility of the witnesses and may choose to believe one witness and disbelieve another).

[63]No. 02-11-00037CV, 2012 WL 5258695, at *12 (Tex. App.—Fort Worth October 25, 2012, no pet. h.) (mem. op.).

[64]*Id.* at *12–13.

38

In this case, Wickliffe did not testify that Copper Canyon will approve the zoning change, and therefore the extra twenty-six acres should be valued as if already commercially zoned. Instead, she testified about how potential buyers and sellers would weigh the probability of the zoning being changed. We overrule this part of Crosstex's first issue.

3. **Whether Wickliffe's comparative-sales analysis is unreliable and irrelevant**.

Crosstex makes three subarguments in this section.

a. *Flawed comparable sales study because of excluded sale.*

Crosstex contends that Wickliffe did not follow the comparable sales methodology because she ignored from her study a known and obviously comparable sale in the immediate vicinity of her included sales. Wickliffe testified that the tract to which Crosstex referred was on a less desirable road than the other three tracts from that subdivision that she did use (and we observe that from the plat map, it appears that the tract is also of a quite different shape). Wickliffe testified that she could have included the property in her analysis by making an adjustment for the property's less desirable location, but nothing in the record or the case law dictates that she was required to. Comparable sales must involve land with similar characteristics, but they need not be in the "immediate vicinity" of the subject land.[65] We have found no case law holding that an opinion

---

[65]*Sharboneau*, 48 S.W.3d at 182.

on market value is unreliable because it does not include a comparable sale in the immediate vicinity of the subject property, and Crosstex has not directed us to any such authority. The record does not show that Crosstex or the Buttons produced any evidence that accepted appraisal methods require certain sales to be included. Accordingly, we cannot hold that Wickliffe's valuation opinion was unreliable merely because it did not include a sale that Crosstex believes is comparable but that Wickliffe did not.

b. *Flawed comparable sales study because of included incomparable sale.*

Crosstex next argues that Wickliffe's comparable sales study was flawed because she improperly included plainly incomparable sales. Crosstex takes issue with three sales in Wickliffe's study: (1) a sale off of highway 465, (2) a sale off of Friendship Road near Lake Ray Roberts, and (3) a property that had two high-voltage electric transmission lines on it.

Regarding the first two sales, Crosstex maintains that Wickliffe conceded that there were huge differences in the values of these two properties but that she failed to report making any adjustments for their disparities. It asserts that the sales "were plainly not comparable even to each other."

When using the comparable sales approach to find the market value of a subject property, the appraiser finds sales of properties that are similar enough to the subject property to be considered comparable to the subject property.[66] The

---

[66] *See id.*

appraiser then adjusts the price of the comparable sales to negate any differences between the comparable properties and the subject property that may be reflected in the price.[67]  After making those adjustments, the appraiser has an idea of what the subject property would sell for in the market.

The "paired sale" approach is similar to the process described above, but instead of attempting to find what similar properties sell for on the market, the appraiser attempts to figure out how much a condition on the subject property affects a property's market value.[68]  The appraiser looks in the marketplace to find sales of properties that are similar to each other, one with the condition and one without, and analyzes those sales to determine how much the condition affects market value.  This method can be used to determine if the presence of a pipeline on a property affects the property's market value:

> A widely recognized method of determining whether a particular characteristic of property has a positive or negative impact on value is a technique known as a paired sales analysis.  If the appraiser can find two recently sold properties that are virtually identical except that one is encumbered by a pipeline or transmission line and one is not, these are called paired sales.  If the pipeline or transmission line is the only significant difference between the two, any difference in

---

[67] *Id.*

[68] This approach should not be confused with another appraisal technique, also apparently referred to as a paired sale analysis, in which two sales of the same property are compared:  "A paired sales analysis compares the selling price of the same property at two or more dates of sale.  If available, the paired sales analysis will measure the accuracy of an opined adjustment for appreciation or depreciation in the market."  James D. Masterman, *The Three Approaches To Value*, Eminent Domain and Land Valuation Litigation, SG059 ALI-ABA 377, 381 (2002).

the sale price may be attributable to the pipeline or transmission line. When done correctly, a paired sales analysis can be compelling evidence of influences on market value.[69]

From her summary report, Wickliffe appeared to have made both types of comparisons. In the main body of her report, Wickliffe discussed the comparable sales that she found, the adjustments she made, and the adjusted market value of those properties. In an addenda, she included a "pipeline study" in which she conducted a paired sales analysis.

These two sales complained of by Crosstex here appeared to be part of her pipeline study rather than the part of her analysis in which she found properties similar to the Buttons' property. That is, they were not each compared with the Buttons' property to find their property's market value. Wickliffe found three properties that she considered similar to each other, one with a pipeline and two without, and compared the sales prices to figure out what kind of impact the presence of the pipeline would have on a property.

In this paired sale analysis, the property with a pipeline sold for $8,000 an acre. One of the properties without a pipeline sold for $12,404 an acre, and the other property with no pipeline sold for $22,300 an acre. In her report, Wickliffe noted that the property that sold for $12,404 an acre had a small creek along one boundary "that does contain some flood area in and around it." Her report

_____

[69]Brandee L. Caswell, *A Primer and Update on Damage Claims Based on Fear and Stigma: There Is A Lot to Learn from the Fear and Loathing in San Bruno*, Prac. Real Est. Law., May 2012, at 21, 26.

reflects that she adjusted the price somewhat to account for the physical differences of the properties.

Wickliffe did agree with Crosstex's attorney that there were huge differences in the two no-pipeline properties' *values*, but she did not testify that there were huge differences between the properties themselves (or between those properties and the Buttons' property) for which she needed to make adjustments to sales prices. Crosstex elicited no such testimony from her, and her report does not reflect such differences. And Crosstex does not tell us in what way the properties were so different from each other (or the subject property) that an adjustment should have or could not be made.[70] Although we recognize the gap between the sales prices, nothing in the record shows that Wickliffe should have accounted for significant differences between the properties and did not. We therefore cannot say that Wickliffe's inclusion of these sales made her opinion so unreliable that it is no evidence. Furthermore, considering that the jury's award reflects that the jury found the property had been damaged by far less than what Wickliffe found, we cannot say that the inclusion of these properties in her analysis resulted in an improper verdict.[71]

---

[70]*See Sharboneau*, 48 S.W.3d at 183 ("The proper inquiry is not whether Patterson made any use of sales that were dissimilar to the condemned property; it is whether Patterson's appraisal method as a whole was relevant and reliable evidence of market value.").

[71]Tex. R. App. P. 44.1(a); *Romero v. KPH Consolidation, Inc.*, 166 S.W.3d 212, 225 (Tex. 2005) (stating that to obtain reversal of a judgment based upon an error in the trial court, the appellant must show that the error occurred and that it

43

Regarding the property with transmission lines, Crosstex argues that Wickliffe conceded that the inclusion of this property in her analysis meant that she did not do a true paired sales analysis; in other words, she "didn't take those two sales and then compare them to a property within that same general location to determine the impact of the pipeline *and* the electric transmission powers." Crosstex argues that it could have been the high voltage lines that reduced that particular property's value rather than the pipeline. Crosstex asserts that Wickliffe agreed that she found a sale of a property that had a pipeline but no electrical transmission line, that the sale was for a higher price than a sale of the nearby property that had both a pipeline and the transmission line over a small part of the property, and that this "could be an indication that that [power line] is one of the factors" to account for a difference between the sales price of those two tracts.

At trial, Wickliffe testified about these properties in discussing the comparable sales she used to determine the market value of the remainder after the installation of the pipeline. As Crosstex points out, these properties were not used in a paired sales analysis. Instead, Wickliffe used the sale of the property with a transmission line as a comparable sale, one of two commercially-zoned properties with pipelines that she considered comparable to the Buttons' property. This comparison was not a "paired sale" analysis because Wickliffe did

probably caused rendition of an improper judgment or probably prevented the appellant from properly presenting the case to this court).

44

not compare two properties to each other to determine the effect of the pipeline. She appeared to have just used the property with the transmission line to find what property like the Buttons' property would sell for when burdened by a pipeline easement.

As for whether the properties were comparable, Wickliffe discussed the power line's presence briefly. She stated that with respect to the properties with the electrical transmission lines, the easements on those properties "were considered to have similar stigmas and damage compared to [the Buttons'] gas pipe easement encumbrance, therefore no adjustments were deemed necessary."

That these sales were not a true paired sales analysis—and Wickliffe did not assert in her report that they were part of a paired sales analysis—does not mean that these properties could not be used as comparable sales to determine the market value of the Buttons' property after the conveyance of the easement and the installation of the pipepline. The assumption that electric power lines could affect a property's value is not unreasonable.[72] As an expert, Wickliffe had to decide whether it was appropriate to make adjustments for differences between properties, and, as the fact finder, the jury had to determine the

---

[72] *See Hunt*, 228 S.W.2d at 156 (holding that an assumption that a pipeline may affect a property's market value "is hardly less reasonable" than a supposition "that an electric power line across a tract may reduce its market value by reason of interference with radio reception of future dwellers on the tract").

45

credibility and weight to be given to her testimony.[73]  Whether power lines are too

dissimilar to a pipeline to make an apt comparison is a determination for the fact-

finder to make.[74]  Crosstex does not argue that Wickliffe's conclusion about the

"stigma" damage from transmission lines being similar to that from having a

pipeline easement was incorrect.  Crosstex does not argue that the comparison

between the properties is too attenuated for Wickliffe to make adjustments or on

what basis it makes that conclusion.  And it does not argue that the other paired

sales analysis that Wickliffe conducted (in addition to the one it complains of

above) does not support the jury's verdict.  Because we cannot conclude that the

inclusion of these sales made her entire opinion unreliable, we overrule this part

of Crosstex's first issue.[75]

c.  *Flawed comparable sales study because of a blended property value.*

Finally under this argument, Crosstex argues that Wickliffe's "concoction of

what she called a 'blended' property value" destroyed any reliability that

remained in her comparable sales analysis.  Crosstex contends that there was

---

[73] *See Collin County v. Hixon Family P'ship, Ltd.*, 365 S.W.3d 860, 873 (Tex. App.—Dallas 2012, pet. denied).

[74] *Sharboneau*, 48 S.W.3d at 182 (stating that a comparison is too attenuated when the appraiser and the fact-finder cannot make valid adjustments for differences between the compared properties).

[75] *Hunt*, 228 S.W.2d at 156 ("Of the various and evidently qualified witnesses who testified in this case to a substantial depreciation in market value we cannot say that every reason given in support of these opinions was invalid at law so as to render all the testimony a nullity.")

46

no evidence that this blended rate was mathematically tied to any of the comparable sales or that it was tethered to any fact, repeatable calculation, or objective analysis.

Wickliffe testified that she used an average per-square-foot price and that she referred to her resulting calculation as a "blended value." The average per-square-foot price she came up with for the market value before the taking was $2.50 per square foot. To come up with this amount, she first determined how much of the property was zoned residential and what she thought that property was worth per square foot. She then determined how much of the property was either already zoned commercial or would probably be zoned commercial in the foreseeable future, and she valued this part of the property based on what a willing buyer would pay considering that the commercial zoning was not in place but that "it was reasonably probable for the zoning to be obtained."

Wickliffe developed an appraisal of the market value this way to show what a buyer would pay for the whole property, not just the commercial part or just the residential part. She stated that in her opinion it would not be fair "to take those two individual components and add them together to arrive at an opinion of value for the subject" because she believed "that would escalate the value of the subject, based on the fact that the zoning is not in place." She noted that some of the properties she used for comparison were also sold for commercial prices even though the properties were not zoned commercial, but "it still is a risk and a time fact that a buyer would consider." Accordingly, because she believed the

47

residential and commercial components of the Buttons' property would sell together, "if you take these individual indicators, you're going to see a number higher than what my actual opinion of the whole property is."

After conducting her sales comparison analysis, Wickliffe determined that the value of the residential component of the tract was $1.15 per square foot and the value of the commercial component was $5.40 per square foot. She then adjusted the value and came up with an average per-square-foot price of $2.50 per square foot, giving the 144 acres of property a value of $15,771,443 before the taking, which she rounded down to $15,771,400.

Wickliffe noted that in her opinion, fifty-two acres of the property had the potential to be commercial and that "[i]f you just did the math, that would indicate about $12,250,000 for the commercial component of the tract." But because she thought it would be overstating the value of the property to simply take the two individual values for the residential component and for the commercial component and add them, she "applied an economic discount for the risk factor that the zoning wasn't in place." In doing so, she determined that "the actual indicator for the commercial component was about $11,400,000."

From this testimony, we can determine how much of her total value calculation was based on commercial and how much was based on residential, how much she valued the commercial property per acre, and how much she discounted the commercial section to compensate for not having zoning in place for the entire fifty-two acres. As Wickliffe testified, one acre is 43,560 square

feet. Multiplying that number by fifty-two (acres) and then by 5.40 (the price per square foot for commercial zoning) results in a value of $12,231,648, a little under her value of "about $12,250,000." We can then see how much Wickliffe discounted the property's value because of the risk associated with twenty-six of the acres not yet having commercial zoning in place. And taking her estimate of the market value of the property and dividing it by the total number of square feet results in a price per square foot of $2.4999, or $2.50—the value that she reported. We can repeat her calculations for the per-square-foot value she reported after the taking. As far as whether her values were tied to her comparable sales analysis, Wickliffe explained to the jury her sales comparison approach and how she reached her conclusions about the value of the commercial portions of the property and the residential portions of the property both before and after the taking.

Although Crosstex argues that Wickliffe came up with her value "seemingly out of thin air," not "tethered to any fact, repeatable calculation, or objective analysis," her trial testimony makes it clear that the value she used is the average price per-square-foot for the property based on her determinations, after a sales comparison analysis, of what the residential and commercial parts of the property were worth. Crosstex makes no argument on appeal that using an average per-square-foot valuation is improper under the law or under accepted appraisal standards, and we found nothing in the record to that effect. We did

49

find, however, at least one other case in which a similar method of valuation was used.[76]

The Buttons also point out that Wickliffe testified (and that appraisal standards provide) that when valuing property with different uses, valuing the uses separately and then adding those values together may show a figure that is higher or lower than the actual value of the total property. We cannot agree that Wickliffe's valuation was "out of thin air" and not tethered to any objective analysis. We overrule the remainder of Crosstex's first issue.

In Crosstex's second issue, it argues that the evidence was not factually sufficient to support the jury's verdict. Because Crosstex relies on the same arguments with respect to Cross's and Wickliffe's testimony as it did under its legal sufficiency issue, we overrule Crosstex's second issue for the same reasons set out above.

## Cross-Appeal

In their sole issue on cross-appeal, the Buttons complain that the trial court erred by not submitting a single broad form jury question as required by *Westgate Ltd. v. State*.[77] The Supreme Court has directed that in partial takings

---

[76] *See City of Texarkana v. Kitty Wells, Inc.*, 539 S.W.2d 205, 207 n.2 (Tex. Civ. App.—Texarkana 1976, no writ).

[77] 843 S.W.2d 448, 457 (Tex. 1992) (holding that the three jury questions required under *Carpenter* for partial takings cases "should be reduced to two questions: first, the market value of the part taken, considered as severed land, and second, damages to the remainder, accompanied by an instruction that such

50

cases, the jury should be asked to make two findings:  the market value of the part taken and damages to the remainder.[78]  The jury questions followed this directive.  The Buttons have not persuaded us that a deviation from this directive was called for in this case, and they have not demonstrated how they were harmed by the question.[79]  We overrule the Buttons' sole issue on cross-appeal.

## Conclusion

Having overruled Crosstex's two issues and having overruled the Buttons' sole issue, we affirm the trial court's judgment.

LEE ANN DAUPHINOT
JUSTICE

PANEL:  DAUPHINOT, MEIER, and GABRIEL, JJ.

DELIVERED:  January 24, 2013

---

damages should be determined by considering the difference between the remainder's pre-and post-taking value").

[78]*Id.*

[79]Tex. R. App. P. 44.1(a); *Romero*, 166 S.W.3d at 225.